ROYAL PRINTING COMPANY and Haythornewhite Enterprises, Individually and on behalf of all others similarly situated, Plaintiffs-Appellants,

v.

KIMBERLY–CLARK CORP., Crown Zellerbach Corp., Boise Cascade Corp., Scott Paper Corp., International Paper Co., Great Northern Nekoosa, Union Camp Corp., Weyerhaeuser Co., Westvaco Corp., and St. Regis Paper Co., Defendants-Appellees.

No. 77–3005.

United States Court of Appeals,
Ninth Circuit.

April 28, 1980.

Susan Y. Illston, Cotchett, Hutchinson & Dyer, San Mateo, Cal., for plaintiffs-appellants.

Robert D. Raven, Kurt W. Melchior, San Francisco, Cal., John T. Anderson, Richard K. Decker, Chicago, Ill., H. Richard Wachtel, New York City, Robert B. Owen, Washington, D. C., Norman M. Heisman, Philadelphia, Pa., for defendants-appellees; Morrison & Foerster, James K. Haynes, Orrick, Herrington, Rowley & Sutcliffe, San Francisco, Cal., Howard T. Milman, Sullivan & Cromwell, New York City, John P. Borgwardt, Portland, Or., Max L. Gillam, Los Angeles, Cal., Marvin D. Morganstein, San Francisco, Cal., John Bates, San Francisco, Cal., Byron E. Kabot, New York City, J. Thomas Rosch, San Francisco, Cal., Lenard G. Weiss, San Francisco, Cal., John D. Swartz, E. Nobles Lowe, New York City, Richard J. Archer, San Francisco, Cal., on brief.

Before BROWNING, CHOY and HUG, Circuit Judges.

CHOY, Circuit Judge:

Appellants Royal Printing Company and Haythornewhite Enterprises sued appellee paper manufacturers for price fixing and other violations of Sherman Act § 1, 15 U.S.C. § 1. After preliminary discovery the district court granted appellees' summary judgment motion on the ground that appellants were not "direct purchasers" from appellees and thus were barred from suing for treble damages under the Clayton Act by *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). We affirm as to Haythornewhite and affirm in part and reverse in part as to Royal Printing.

I. *Introduction*

Appellees are ten of the nation's largest manufacturers of paper products. Appellants are relatively small retail businesses which buy paper products and resell them, along with other goods and services, to the public. (Royal is a printer; Haythornewhite operates grocery and liquor stores.)

The manufacturers sell their paper products at the wholesale level through their wholesaling divisions or wholly-owned subsidiaries, as well as through independent wholesalers. The divisions and subsidiaries wholesale the products of all manufacturers, not limiting themselves to in-house products.[1]

Appellants admit that they never bought paper products directly from any manufacturer, except that Royal Printing made purchases from Crown Zellerbach's wholesaling division. However, Royal Printing never bought any Crown Zellerbach products from the Crown Zellerbach division, only products of other appellee manufacturers.

The rest of appellants' purchases were made through wholesaling firms. Most of these purchases were made through independents not affiliated with any manufacturer. Royal Printing did buy some paper from Butler Paper Company, a subsidiary of a subsidiary of Great Northern Nekoosa, but it seems agreed that this paper was manufactured by other appellees and not by Great Northern Nekoosa.[2]

---

1. All three types of wholesalers compete on even terms. Therefore, each wholesaler necessarily sets its price according to its perception of market and other factors, and a reconstruction of what price a wholesaler would have charged if the mill price of paper products had been lower would require a vast panoply of evidence regarding supply and demand, divergences between theoretical and actual market conditions and performance, etc.

2. Butler Paper submitted an affidavit stating that it had never sold Great Northern Nekoosa paper to Royal Printing. Great Northern Nekoosa submitted an affidavit stating that it did not manufacture the kind of paper Royal Printing bought. Royal Printing's owner stated in a deposition that he had bought "Nekoosa" paper from Bulter Paper, but this allegation was never put in the affidavit form demanded by Federal Rule of Civil Procedure 56(e), and the point was not argued by appellants below or here. We consider Royal Printing to have abandoned this contention.

Haythornewhite bought only from independent wholesalers.

During the pretrial proceedings the Supreme Court announced its *Illinois Brick* decision. On the basis of that case, the district court granted summary judgment in favor of the manufacturers on the ground that appellants were merely "indirect purchasers" of allegedly price-fixed goods.

## II. *Hanover Shoe and Illinois Brick*

In *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 487–94, 88 S.Ct. 2224, 2228–32, 20 L.Ed.2d 1231 (1968), an antitrust defendant tried to disprove plaintiff's damages by showing that plaintiff (a "direct purchaser" of defendant's goods) had "passed on" to its customers, in the form of higher prices, the costs imposed upon it by the defendant's illegal conduct. The Supreme Court banned the use of this "defensive pass-on" theory in private antitrust suits under Clayton Act § 4, 15 U.S.C. § 15, because determining how much of plaintiff's damages had been passed on and how much had been "absorbed" (*i.e.*, were actually borne by the plaintiff) "would often require additional long and complicated proceedings involving massive evidence and complicated theories." *Id.* at 493, 88 S.Ct. at 2231.[3] Thus, the Court permitted a direct purchaser to recover, trebled, an amount that exceeded its true damages.

In *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), the antitrust plaintiff was an "indirect purchaser"; it alleged that the defendant manufacturers had fixed a product's price and middlemen had passed on at least some of the overcharge to it. The Supreme Court banned the use of this "offensive pass-on" theory in cases where the defendant could not use defensive pass-on. Allowing offensive pass-on would introduce intolerable complexities of proof and economics and severely compromise the viability of the entire private-enforcement antitrust apparatus. *Id.* at 731–32, 737–45, 97 S.Ct. at 2067, 2070–74. Therefore, offensive pass-on cannot be used except where "[t]he effect of the overcharge is essentially determined in advance, without reference to the interaction of supply and demand that complicates the determination in the general case." *Id.* at 736, 97 S.Ct. at 2070.

The *Illinois Brick* Court also was concerned that allowing indirect purchasers to sue remote price-fixers would open the door to multiple liability for defendants. For if the indirect purchaser recovered, trebled, the full amount of the overcharge (or the portion of it that had in fact been passed on to him) from the price-fixer, the direct purchaser (the middleman) could also recover, trebled, the full amount of the overcharge. (The middleman could recover the full amount even if he passed it on to the indirect purchaser, because *Hanover Shoe* forbids the use of defensive pass-on.) The Court refused to countenance this possibility of multiple liability. *Id.* at 730–31, 97 S.Ct. at 2066–67. Therefore, it barred indirect purchasers' suits, and left the field of private antitrust enforcement to the direct purchasers.

## III. *Analysis*

### A. *Introduction*

The threat of private treble-damages suits is vital to the enforcement of the antitrust laws. *See, e. g., Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130–31, 89 S.Ct. 1562, 1580, 23 L.Ed.2d

---

**3.** The *Hanover Shoe* Court was also concerned that if defensive pass-on was allowed, antitrust violators might be able to show that all or most of the overcharge had been passed on by wholesalers and retailers to individual consumers. Then the wholesalers and retailers would not be able to show any damages, and the consumers "would have only a tiny stake in a lawsuit and little interest in attempting a class action." Thus, the antitrust violators would keep their ill-gotten gain, and the deterrent power of the private antitrust suit would be nullified. 392 U.S. at 494, 88 S.Ct. at 2232; *see Illinois Brick*, 431 U.S. at 725–26, 745, 97 S.Ct. at 2064, 2074. However, the Supreme Court has indicated that this rationale was less important than the one based on complexity of proof. 431 U.S. at 732 n. 12, 97 S.Ct. at 2067 n. 12.

129 (1969); *Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 139, 88 S.Ct. 1981, 1984, 20 L.Ed.2d 982 (1968). It was the purpose of *Hanover Shoe* and *Illinois Brick* to increase the effectiveness and deterrent power of such suits. *See* 392 U.S. at 493–94, 88 S.Ct. at 2231–32; 431 U.S. at 732, 734–35, 737, 741, 745–46, 97 S.Ct. at 2067, 2068, 2069, 2070, 2072, 2074.

The role of "private attorneys general" in the antitrust field was restricted by *Illinois Brick* to direct purchasers, however, because of the twin rationales of danger of multiple liability and complexity of proof. Because Royal Printing's suit would involve neither that danger nor that complexity, we hold that *Illinois Brick* does not bar an indirect purchaser's suit where the direct purchaser is a division or subsidiary of a co-conspirator.

## B. *Multiple Liability/No Liability*

There is little reason for the price-fixer to fear a direct purchaser's suit when the direct purchaser is a subsidiary or division of a co-conspirator. Even if the pricing decisions of such a subsidiary or division are necessarily determined by market forces,[4]

its litigation decisions will usually be subject to parental control. The co-conspirator parent will forbid its subsidiary or division to bring a lawsuit that would only reveal the parent's own participation in the conspiracy. Allowing Royal Printing to sue under these circumstances will not pose the same risk of multiple liability held objectionable in *Illinois Brick*.

We recognize that there is, in fact, some small chance that such a subsidiary or division might wish to sue its parent's co-conspirators.[5] The parent might be under government pressure or discover that the conspiracy is not sufficiently profitable; and if a subsidiary has outside shareholders, a derivative suit might be a possibility. In such an event, multiple liability might lurk.

But because as a practical matter the chance of a direct-purchaser suit is so small, the correspondingly small risk of multiple recovery does not disturb us.[6] This is especially so when our only alternative is to effectively immunize the transactions here from private antitrust liability, thus thwarting a vital part of the antitrust enforcement scheme and the expressed purpose of *Illinois Brick*.[7]

---

**4.** *See* note 1 *supra*. Footnote 16 of *Illinois Brick*, which apparently establishes an exception to the ban on pass-on theories "where the direct purchaser is owned or controlled by its customer," is only illustrative of the real exception: where "[t]he effect of the overcharge is essentially determined in advance, without reference to the interaction of supply and demand that complicates the determination in the general case," and where the arrangement "circumvent[s] complex market interactions as would a [pre-existing] cost-plus contract." 431 U.S. at 736, 97 S.Ct. at 2070. Although the wholesalers here are owned or controlled by appellees, the wholesalers' pricing decisions are determined by market forces; therefore, footnote 16 is inapplicable.

**5.** It does not seem that a subsidiary's suit would be barred by imputation of its parent's fault, for the Supreme Court has refused to "undermine the antitrust acts by denying recovery to injured parties merely because they have participated to the extent of utilizing illegal arrangements formulated and carried out by others." *Perma Life Mufflers*, 392 U.S. at 139, 88 S.Ct. at 1984. A suit brought by a division of a conspirator would not be barred by *in pari delicto*, for that defense cannot be

used in antitrust cases, *id.* at 140, 88 S.Ct. at 1985. Five members of the *Perma Life Mufflers* Court stated in dictum, however, that a plaintiff's "truly complete involvement and participation in a monopolistic scheme," *id.*, should be a complete defense to its antitrust action. *See id.* at 146, 147, 149, 154, 88 S.Ct. at 1988, 1989, 1992. If there is such a defense, it might bar a suit brought in the corporate name by a conspirator's division.

**6.** Of course, if the plaintiff purchased a defendant's goods through the defendant's own wholesaling subsidiary, there would be even less likelihood that the direct-purchaser subsidiary would ever also sue the defendant and create a potential multiple liability.

If the plaintiff purchased a defendant's goods through the defendant's own wholesaling division, the plaintiff would qualify as a "direct purchaser" from the corporate defendant and could sue for the entire amount of the overcharge, trebled.

**7.** The *Illinois Brick* Court recognized that even in the usual case where direct purchasers are not related to a co-conspirator, "direct purchasers sometimes may refrain from bringing a tre-

### C. Suit for Entire Amount of Overcharge

Determining what portion of the illegal overcharge was "passed on" to Royal Printing and what part was absorbed by the middlemen would involve all the evidentiary and economic complexities that *Illinois Brick* clearly forbade. 431 U.S. at 731–32, 737–45, 97 S.Ct. at 2067, 2070–74. Thus Royal Printing cannot sue the appellees only for the portion of the overcharge that was passed on to it through the wholesaling subsidiary and division.

The only alternatives are to allow Royal Printing to sue the appellees for the entire amount of the overcharge to the wholesalers, or not to allow Royal Printing to sue the appellees at all.

Because, as we have already shown, as a practical matter the direct purchasers here will never sue, barring Royal Printing's suit would close off every avenue for private enforcement of the antitrust laws in such cases. This would be intolerable.

Allowing Royal Printing to sue for the full overcharge, on the other hand, creates the possibility that Royal Printing might recover an amount, trebled, that exceeds its actual damages (because market forces probably forced the middlemen to absorb part of the overcharge); to that extent this alternative affords Royal Printing an opportunity for a windfall gain. But this is no more than was approved in *Hanover Shoe*, where the plaintiff was allowed to recover its "full" damages even though it had "mitigated" its damages by passing part of the excessive costs on to its customers. *Hanover Shoe* teaches that in such situations there is nothing wrong with the plaintiff winning a windfall gain, so long as the antitrust laws are vindicated and the defendant does not suffer multiple liability, with its potential for windfall loss (*i.e.*, the defendant would be forced to pay out a greater amount, trebled, than its antitrust violation grossed for it).[8]

Because there is a sufficiently small risk of multiple liability here, and because without a pass-on theory the case would not involve *Illinois Brick*-style complexities, we hold that Royal Printing may sue the appellees for the entire overcharge.

### IV. Conclusion

Neither of the rationales (multiple liability and complexity) underlying *Illinois Brick* bars Royal Printing's suit against the manufacturers of the products it purchased from Great Northern Nekoosa's subsidiary and from Crown Zellerbach's division. Whichever of the appellees those manufacturers might be, Royal Printing can also sue all the other appellees on a theory of joint and several liability. *See Chattanooga Foundry & Pipe Works v. City of Atlanta*, 203 U.S. 390, 27 S.Ct. 65, 51 L.Ed. 241 (1906) (upholding antitrust verdict against horizontal co-conspirator of actual seller, even though actual seller was not sued). As to these transactions, the summary judgment against Royal Printing is REVERSED.

■ The remainder of Royal Printing's purchases, and all of Haythornewhite's,

---

ble-damages suit for fear of disrupting relations with their suppliers." 431 U.S. at 746, 97 S.Ct. at 2074. Even so, the Court concluded that "on balance," its new rule would serve well the purposes of private antitrust enforcement. *Id.* Here, on the other hand, blind application of the *Illinois Brick* rule would eliminate the threat of private enforcement. Royal Printing's customers are surely barred by *Illinois Brick* from suing the appellees; if Royal Printing is also so barred, and the controlled wholesalers will not sue, the appellees' transactions would be immune from private antitrust enforcement.

8. The *Illinois Brick* Court considered and rejected the arguments that "it is better for the defendant to pay sixfold or more damages than for an injured party to go uncompensated" and that "a little slopover on the shoulders of the wrongdoers . . . is acceptable." Allowing offensive pass-on inevitably increases the risk of multiple recoveries and, concluded the Court, "We do not find this risk acceptable." 431 U.S. at 731 n. 11, 97 S.Ct. at 2067 n. 11. The Court was not, however, considering the situation where the direct purchaser is controlled by a co-conspirator. In that situation, particularly where the alternative would be to virtually immunize price-fixed transactions from private liability, we think the Court would find the practical risk of multiple liability so small as to be "acceptable."

were made through independent wholesal-
ers.[9] As to these purchases, appellants are
truly indirect purchasers from appellees and
are barred by *Illinois Brick*, so the summary
judgment is to that extent AFFIRMED.

**9.** Haythornewhite did not sufficiently present
to the district court's attention its theory,
raised here, that the wholesalers from whom it
purchased were the unnamed co-conspirators
referred to in the complaint. This argument
was raised below, if at all, only in a single
sentence in the memorandum opposing sum-
mary judgment: "Deposition testimony has re-
vealed several suppliers of paper, some of
whom may be co-conspirators or subsidiaries."
We construe this sentence to suggest that some
of the "suppliers" were co-conspirator manu-
facturers and that others were wholesaling sub-
sidiaries of conspirators, but not that any of the
apparently independent wholesalers with
whom Haythornewhite dealt were actually in
the conspiracy. Our opinion is supported by
the citation, immediately following the quoted
sentence, to the deposition of Contreras, the
owner of Royal Printing, who did not discuss
Haythornewhite's suppliers.

Because this allegation was not fairly
presented to the district court, we need not
consider it here. In any event, the Fifth Circuit
has ruled that a plaintiff cannot avoid the *Illi-
nois Brick* rule where the co-conspiring inde-
pendent middleman is not named as a party
defendant, because the middleman could later
sue the defendant on his own account and
subject him to multiple liability. *In re Beef
Industry Antitrust Litigation*, 600 F.2d 1148,
1163 (5th Cir. 1979) (Wisdom, J.).