**CITY OF CLEVELAND, Plaintiff,**

v.

**The CLEVELAND ELECTRIC, ILLUMINATING COMPANY, Defendant.**

**Civ. A. No. C75–560.**

United States District Court,
N. D. Ohio, E. D.

Oct. 31, 1980.

For Order on Motion to Reconsider,
see 538 F.Supp. 1328.

---

William B. Norris, Hahn, Loeser, Freedheim, Dean & Wellman, James E. Young, Thomas E. Wagner, Director of Law City of Cleveland, Cleveland, Ohio, for plaintiff.

John Lansdale, James P. Murphy, Squire, Sanders & Dempsey, Cleveland, Ohio, for defendant.

## MEMORANDUM AND ORDER

KRUPANSKY, District Judge.

By motion filed October 17, 1980 with accompanying brief, plaintiff seeks to bar defendant from introducing any evidence or advancing any argument to the jury with respect to the pass-on defense. Defendant, by memoranda filed October 15 and October 20, 1980, opposes such motion and maintains that plaintiff is entitled to no damages for defendant's refusal to wheel power from the Power Authority of the State of New York (PASNY), even if such refusal was wrongful. The matter is presently before the Court for its determination.

The pass-on defense, in its classic form, is an assertion that the victim of an illegal price-fixing scheme is not directly entitled to recover antitrust damages from the price-fixer because the victim passed on the higher price to its customers who, in fact, bore the cost of the violation. The pass-on theory has not generally met with approval among the authorities.

In *Hanover Shoe v. United Shoe Machinery Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), the United States Supreme Court considered the pass-on defense in the context of the claim by plaintiff Hanover that it was damaged by being

forced to lease important machines from defendant United at a higher cost to Hanover than buying the machines. United claimed that Hanover suffered no injury because Hanover merely raised the retail price of its shoes to reflect the higher cost of leasing the machines and so maintained its profit level. The Court rejected United's use of the pass-on defense as a matter of law and held that any attempt to establish the effect of an antitrust violation upon Hanover's prices, volume of sales, costs and profits "would require a convincing showing of each of these virtually unascertainable figures * * * [and] would normally prove insurmountable." 88 S.Ct. at 2231. The Court further noted additional insurmountable obstacles in meeting the pass-on defense by observing that "antitrust defendants will frequently seek to establish its applicability. Treble damage actions would often require additional long and complicated proceedings involving massive evidence and complicated theories." *Hanover Shoe, supra*, at 2231. The *Hanover Shoe* Court also observed the use of the pass-on defense would place upon the ultimate individual consumer the responsibility for initiating a treble damage action against the original antitrust violator. The Court concluded that such individuals "would have only a tiny stake in a lawsuit and little interest in attempting a class action." *Supra* at 2232.

> In consequence, those who violate the antitrust laws by price fixing or monopolizing would retain the fruits of their illegality because no one was available who could bring suit against them. Treble damage actions, the importance of which the court has many times emphasized, would be substantially reduced in effectiveness.
>
> *Supra* at 2232.[1]

The decision in *Hanover Shoe* recognized that where "an overcharged buyer has a pre-existing 'cost-plus' contract", the "considerations requiring that the passing-on

defense not be permitted in this case would not be present." *Supra* at 2232.

In *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), the Supreme Court refused to permit the use of the pass-on theory by antitrust plaintiffs who were indirect purchasers of the alleged violator and held that the "cost-plus" exception it carved out in *Hanover Shoe, supra*, was narrow.

> [T]his Court in Hanover Shoe indicated the narrow scope it intended for any exception to its rule barring pass-on defenses by citing, as the only example of a situation where the defense might be permitted, a pre-existing cost plus contract. In such a situation, the purchaser is insulated from any decrease in its sales as a result of attempting to pass-on the overcharge, because its customer is committed to buying a fixed quantity regardless of price. The effect of the overcharge is essentially determined in advance, without reference to the interaction of supply and demand that complicates the determination in the general case.
>
> *Supra* 97 S.Ct. at 2069–70.

The Court affirmed that allowing the use of pass-on theories:

> would transform treble-damages actions into massive efforts to apportion the recovery among all potential plaintiffs that would have absorbed part of the overcharge—from direct purchasers to middlemen to ultimate consumers. However appealing this attempt to allocate the overcharge might seem in theory, it would add whole new dimensions of complexity to treble damages suits and seriously undermine their effectiveness.
>
> *Supra* at 2070. The Court concurred in the judgment of *Hanover Shoe* that:
>
> the antitrust laws will be more effectively enforced by concentrating the full recovery for the overcharge in the direct purchasers rather than by allowing every

---

1. This second rationale has been interpreted by the Court in *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977) as less important to the decision to bar the pass-on defense than the first reason—the difficult and complicated standards of proof. *Illinois Brick, supra* at 2067, n. 12.

plaintiff potentially affected by the over-charge to sue only for the amount it could show was absorbed by it.

*Supra* at 2069.

The Sixth Circuit Court of Appeals recently addressed the pass-on theory in *Jewish Hospital Association v. Stewart Mechanical Enterprises*, 628 F.2d 971 (1980) and construed *Illinois Brick* as stating two exceptions to the pass-on bar: a "control" exception and an exception for the functional equivalent of a pre-existing cost-plus contract. The control exception, as determined by the Court in *Jewish Hospital, supra*, "is limited to relationships involving such functional economic or other unity between the direct purchaser and either the defendant or the indirect purchaser that there effectively has been only one sale." *Supra* at 975 (citation omitted). Explaining the reason for the cost-plus exception, the Court noted that "because passing on the entire amount of the overcharge cannot decrease its sales, the direct purchaser has no incentive to absorb any of the overcharge itself." *Supra,* at 976. The facts of the instant case do not support an exception to the bar on the pass-on defense under either theory as defined in *Jewish Hospital, supra.*

■ An examination of the record discloses no "ownership or control relationship between an indirect purchaser [retail customers] and a direct purchaser [MELP, that] might make the passing-on bar inapplicable." *Jewish Hospital, supra* at 975. The fact that MELP customers, as citizens of Cleveland, "control" MELP through the city council does nothing to convert a sale of wholesale power to MELP and its subsequent sale at retail from a two step transaction into the equivalent of a single sale. MELP does not operate as a purchasing agent for its customers. As this Court noted in its Memorandum and Order of October 15, 1980, 538 F.Supp. 1303, a municipal utility in Ohio is, by law, a proprietary venture in the operation of which municipal officials may act as would officers of a private corporation even to the point of making a profit and selling services, within the Constitutional limit, to non-citizens. *See Butler v. Karb*, 96 Ohio St. 472, 117 N.E. 953 (1917); *Travelers Ins. Co. v. Wadsworth*, 109 Ohio St. 440, 142 N.E. 900 (1924); *Niles v. Union Ice Corp.*, 133 Ohio St. 169, 12 N.E.2d 483 (1938); *State ex rel. Wilson v. Hance*, 169 Ohio St. 457, 159 N.E.2d 741 (1959). Nothing in the record suggests that any "control" of MELP by Cleveland citizens through their government served to suspend the operation of market forces in the sale of electricity to those citizens. To the contrary, the evidence adduced in the instant case demonstrates that Cleveland citizens abandoned their relationship with MELP in response to market forces. Accordingly, the record fails to establish such "functional economic unity" as between MELP and its customers to make a sale of wholesale power to MELP effectively a sale to MELP customers within the "control" exception of *Illinois Brick, supra* and *Jewish Hospital, supra. See Perkins v. Standard Oil Co.*, 395 U.S. 642, 89 S.Ct. 1871, 23 L.Ed.2d 599 (1969) and *In re Western Liquid Asphalt Cases*, 487 F.2d 191 (9th Cir. 1973), *cert. den.*, 415 U.S. 919, 94 S.Ct. 1419, 39 L.Ed.2d 474 (1974). *See also In re Sugar Industry Antitrust Litigation*, 579 F.2d 13, 18 (3rd Cir. 1978).

Because "pre-existing cost-plus contracts are outside of the rationale of the passing-on bar", *Jewish Hospital, supra* at 976, the defendant urges that plaintiff's contract with PASNY be construed as equivalent to a pre-existing cost-plus contract for fixed quantities that does not depend upon market forces. Defendant's Reply Memorandum, October 20, 1980 at 4, 5. The defendant charges that MELP is obligated to buy a fixed quantity of PASNY power and to re-sell the entire amount to MELP residential customers on a cost-plus basis. The defendant claims that because the PASNY allocation of 30 mw is far below MELP's total load (100 mw), there is the functional equivalent of guaranteed demand.[2] The defendant further assumes that the entire

---

2. This requires the assumption that the PASNY allocation would have replaced on a unit for unit basis the first 30 mw of MELP's load and so been isolated from any change in total load.

differential between PASNY power and the presumably more expensive power it would have replaced must be passed-on to residential consumers. The defendant urges that the plaintiff was, at least up to the sale of 30 mw, insulated from any decrease in sales caused by price. The defendant further claims that because MELP could make no profit on selling PASNY power, MELP had no profits which could be affected by an overcharge. Such an argument misapprehends the nature of the cost-plus exception with reference to the facts of the instant case.

The cost-plus exception recognized by *Hanover Shoe, supra,* and affirmed in *Illinois Brick, supra* and *Jewish Hospital, supra* obtains in circumstances wherein the ultimate effect of an overcharge by an antitrust violator upon any subsequent sales can be "determined in advance, without reference to the interaction of supply and demand." *Illinois Brick, supra* 97 S.Ct. at 2070. In other words, because the indirect purchasers are "committed to buying a fixed quantity regardless of price" (*supra,* at 2070) "the direct purchaser has no incentive to absorb any of the overcharge itself." *Jewish Hospital, supra* at 976.

The application of the cost-plus exception to the issues of the instant case is fatally flawed by the fact that the effect upon MELP of the loss of PASNY power is not confined exclusively to 30 mw of power in an inelastic market, but is based upon how cheaper PASNY power would reduce the total cost of what MELP pays for all power purchased for residential resale and how that would reduce the cost of every kwh offered for sale. Conversely, the effect of overcharging MELP for a portion of its total supply cannot be said to be restricted to that portion when MELP bills its customers for that power by adding together all expenses for purchased power and dividing by the total number of kilowatt hours distributed. PTX–2218, Appendix G–2. Accordingly, the price of every single kwh offered by MELP in the marketplace is dependent upon and derived from the sum of what is paid for power from all sources.

It is impossible to measure the effect of an overcharge which raises the total cost of purchased power and thus the price of every kwh without reference to the interaction of supply and demand, i.e. without adducing evidence to quantify the elasticity of demand for electricity in relation to price within the relevant market. There is further no evidence in the record to show that MELP's pricing policy is so rigid that elements of the price representing the cost of operating the system were immune from being reduced if the total price would sharply decrease demand. In short, there is incentive for MELP to absorb perfectly proper costs which, if joined with a lower PASNY power charge, would be part of a competitive price but, when joined with a fixed overcharge would be part of an uncompetitive price. MELP therefore may have reacted to the overcharge occasioned by the loss of PASNY power by taking steps to reduce otherwise proper costs in an attempt to offer a competitive price. The court has no way of ascertaining precisely how MELP reacted to the alleged overcharge. Nor can the Court determine the consequential effects of MELP's reaction on its sales and demand. This is exactly the type of uncertainty that lies at the heart of the Court's bar on the pass-on defense in *Hanover Shoe*:

> Since establishing the applicability of the passing-on defense would require convincing showing of each of these virtually unascertainable figures, the task would normally prove insurmountable. * * * [T]reble-damage actions would often require additional long and complicated proceedings involving massive evidence and complicated theories.

88 S.Ct. at 2231.

This Court's conclusions are consistent with *In re Beef Industry Antitrust Litigation,* 600 F.2d 1148 (5th Cir. 1979), upon which defendant relies heavily. In that case, plaintiff cattle producers could not delay the sale of fattened cattle beyond three weeks of the date when they reached choice grade. The chain stores, who were the ultimate buyers, had extensive storage

facilities and so could delay buying for a considerable time. This allowed the stores to buy at low prices. The beef processors in the middle knew that they could buy all the cattle they needed themselves regardless of what price they paid. The middlemen had no incentive to maintain the price paid for cattle and to absorb the loss occasioned by selling at a depressed price. *Beef Industry, supra* at 1164–66. Because of the "structural inelasticity of short term supply" and the use of "rigid formula pricing", the Court found *Illinois Brick, supra* inapplicable and held that the plaintiffs had alleged the functional equivalent of a pre-existing cost-plus contract. *Beef Industry, supra* at 1166.

The instant case includes the uncertainties and problems of proof that troubled the Court in *Illinois Brick, supra* and were not found to be present in *Beef Industry, supra.* The retail market for electricity is not structurally inelastic but rather responds, within limits, to the price per kwh. MELP competes for business in that market with a rate based upon the sum of total expenses for power and total operating costs. MELP's rate, and so its competitive position, is thus affected by an illegal increase in the aggregate cost of purchased power. MELP therefore would have incentive to absorb the effect of the overcharge by cutting otherwise proper fixed costs within its control, contrary to the manner in which rigid pricing formulas were used in *Beef Industry*, to maintain an acceptable price. The holding in *Beef Industry, supra* is thus distinguishable. *See Royal Printing Co. v. Kimberly-Clark Corp.*, 621 F.2d 323 (9th Cir. 1980); *Eastern Airlines, Inc. v. Atlantic Richfield Co.*, 609 F.2d 497 (Em.App.1979), *Phillips v. Crown Central Petroleum Corp.*, 602 F.2d 616 (4th Cir. 1979); *Midwest Paper Products Co. v. Continental Group, Inc.*, 596 F.2d 573 (3rd Cir. 1979); *United States v. Consolidated Edison Co.*, 580 F.2d 1122 (2d Cir. 1978).

For the foregoing reasons, even on the level of pure economic theory, the plaintiff's final rate per kwh does not become the product of rigid formula pricing nor does the PASNY transaction become a pre-existing cost-plus contract except in some unreal market which isolates the sale of 30 mw from plaintiff's entire load and pre-supposes fixed demand therefor by reference back to the entire load.

■ The Court further finds without merit defendant's assertion that failure to permit the pass-on defense would result in a windfall to plaintiff while defendant received no benefit from refusing to wheel. The Court in *Royal Printing, supra*, noted that:

> Hanover Shoe teaches that in such situations there is nothing wrong with plaintiff winning a windfall gain, so long as the antitrust laws are vindicated and defendant does not suffer multiple liability, with its potential for windfall loss.... 621 F.2d at 327.

Further, defendant's assertion that it received no benefit in profits by refusing to wheel plaintiff cheaper power merely begs the question of why it so refused if such refusal was not profitable. The fruit of the defendant's illegality, if that be the conclusion of the fact-finders, was the unascertainable benefit of competing against an artifically high price or against a competitor engaged in ruinous cost cutting. The Court cannot conclude that a damage award under such circumstances would "fly in the face of long established notions of damage awards." Defendant's Memorandum, October 15, 1980, at 5.

The final issue argued in the memoranda addresses the limit of plaintiff's damages for any illegal refusal to wheel. The defendant argues that any recovery be limited to the length of the current contract with PASNY and that any damages beyond that point would be speculative. Defendant's Memorandum, October 20, 1980, at 6. The plaintiff argues that the length of time for which damages may be recovered is a fact question for the jury.

In *Zenith Radio Corp. v. Hazeltine Research Inc.*, 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971) the Court said:

> in antitrust actions, as in others, * * * if injury * * * [has] accrued as of a certain

date, future damages that might arise from the conduct sued on are unreasonable if the fact of their accrual is speculative or their amount and nature unprovable.

*Supra* 91 S.Ct. at 806 (citations omitted). In *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946) the Court defined impermissible speculation. The Court stated that while a jury may not award damages "based on speculation or guesswork",

> the jury may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly. On such circumstances, juries are allowed to act on probable and inferential as well as [upon] direct and positive proof.

*Supra* 66 S.Ct. at 580 (citations omitted). The Sixth Circuit, in *Elyria-Lorain Broadcasting Co. v. Lorain Journal Co.*, 358 F.2d 790 (1966) cited *Bigelow* and held that:

> [T]he trier of the facts may make a just and reasonable estimate of the damage based on relevant data and may act upon probable and inferential as well as direct and positive proof.

*Supra* at 793.

■ Applying the pronounced standards to the case at bar, the Court observes that the evidence does not support a just and reasonable inference that it is probable that Cleveland will receive any future PASNY allocations. And there is no evidence to permit any reasonable inference as to an amount of any possible allocation.

Initially, the Court notes that the current PASNY contract with AMP–Ohio does not contain an automatic renewal clause. Each time a contract expires, PASNY initially determines if the amount of power involved in that contract should continue to be made available for out-of-state sale. The Niagara Redevelopment Act, 16 U.S.C.A. § 836 *et seq.* (1957), which provides for the development of the Niagara Project by PASNY, does not require PASNY to supply a fixed quantity of power to out-of-state customers. The act requires only that PASNY make available "a reasonable portion" of the project power to neighboring states.

That portion is not to be construed to exceed 20 per cent of what is available for public use. This does not comport with plaintiff's assertion that Congress set aside a fixed block for use by public bodies in neighboring states. Plaintiff's Brief of October 17, 1980 at 1.

Further, assuming that PASNY would decide to allocate a given amount of power for out-of-state sale, that allocation would be distributed, in whole or in part, by the PASNY Board to successful applicants upon approval by the Governor of New York. The record is utterly devoid of any relevant evidence regarding the manner in which PASNY would determine the comparative benefit of one application as against applications by other potential recipients. There is also an absence of any relevant evidence concerning the standards that would be applied by the Governor of New York in approving or rejecting proposed contracts. Nor is there any evidence to support a reasonable inference that proposed contracts have historically been approved or rejected. There is further the difficulty of applying any such evidence, should it exist, to the future actions of the governor since to do so would involve speculation as to the individual who would hold that office in 1985 at the close of the current PASNY—AMP–Ohio—Cleveland contract.

There is equally no basis for inferring that Cleveland would receive any PASNY power through AMP–Ohio, assuming that AMP–Ohio continues to receive such power.

The evidence is clear that PASNY deals only with a recognized "bargaining agent" in a neighboring state. Joint Stipulation No. 4, Tr. 1431; PTX 2218, Sec. 1, p. 1. The evidence is equally clear that AMP–Ohio is such a designated agent in Ohio. Joint Stipulation No. 4, Tr. 1431; PTX 2218, Sec. 1, p. 1. The result is that in order to obtain PASNY power, the plaintiff must operate through AMP–Ohio. PTX 1654.

The plaintiff, in order to support any reasonable inference that it would continue to be the recipient of PASNY power should AMP–Ohio's contract with PASNY be re-

newed, must show that it is reasonable to infer that Cleveland will be the beneficiary of AMP–Ohio's allocation. To support such an inference, the plaintiff simply assumes that because AMP–Ohio agreed to provide Cleveland with all PASNY power under the current contract, any future contract would probably be on the same terms. PTX 1654; PTX 1396; PTX 2231. In fact, the evidence indicates that the agreements made on Cleveland's behalf by AMP–Ohio in pursuing the existing contract are unique and are not likely to extend beyond the term of the contract.

In PTX 2218, AMP–Ohio's application to PASNY, AMP–Ohio represents that it has achieved the capability of delivering PASNY power "to over 80% of the State of Ohio." PTX 2218, Sec. 1, p. 2. AMP–Ohio further represents that the re-allocation of all 30 mw to Cleveland is the result of special circumstances and would not be followed in the future.

### 4. FUTURE AMP–OHIO, INC. ALLOCATION POLICY

AMP–Ohio, Inc. is constituted as a nonprofit agency dedicated to the mutual benefit of its member utilities. Whereas the grave power situation in the City of Cleveland would dictate the allocation of the 30 megawatts of Niagara power, if available, it should be considered an emergency situation only. All future contracts, with the exception of emergencies, that might be arranged for the purchase and wheeling of power, both from within and outside of Ohio, should allocate power for the mutual benefit of the member utilities. A portion of the power available should be allocated in the ratio of peak demands of the various systems. Any portion of the power not utilized by a member of the utility should be re-allocated, based upon the approval of the member utilities. PTX 2218, Appendix A. p. 2.

This was clearly stated by the AMP–Ohio board in their resolution authorizing the PASNY application. The board resolved:

II. That AMP–O, Inc. hereby re-allocates this 30 mw when available to the City of Cleveland, Ohio, on an emergency basis. Future contracts, with the exception of emergencies, will allocate all available power for the mutual benefit of all its member municipal utilities. PTX 2218, Appendix F.

In light of such evidence, even if the jury could estimate with reasonable probability an amount of power PASNY would continue to allocate to AMP–Ohio, any subsequent conclusion that Cleveland would receive a probable allocation from AMP–Ohio would be the product of nothing but highly impermissible speculation. This Court, therefor, upon application of the tests stated in *Zenith Radio, supra* and *Bigelow, supra,* concludes, as a matter of law, that the evidence herein is not of such a nature as to become the basis of permissible inferences by the jury on the issue of probable continuing availability of PASNY power to the plaintiff beyond the expiration of the current contract in 1985. Accordingly, in the event defendant's refusal to wheel PASNY power is found to be unlawful, no damages may be claimed for any period beyond June 30, 1985.

The Court further concludes, for reasons more fully developed above, that the plaintiff's motion *in limine* is well-taken. Accordingly, said motion is hereby granted and defendant is foreclosed from introducing any evidence or advancing any argument to the effect that, in the event liability is determined, damages to the plaintiff were or should have been reduced by an amount passed on to MELP customers.

IT IS SO ORDERED.