**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DELAWARE VALLEY SURGICAL
SUPPLY INC.; NIAGARA FALLS
MEMORIAL MEDICAL CENTER,
            *Plaintiffs-Appellees,*

BAMBERG COUNTY MEMORIAL
HOSPITAL & NURSING CENTER,
            *Plaintiff-Appellant,*

            v.

JOHNSON & JOHNSON; JOHNSON &
JOHNSON HEALTH CARE SYSTEMS
INC.; ETHICON INC.; ETHICON ENDO
SURGERY INC.,
            *Defendants-Appellants.*

No. 08-55105

D.C. No.
CV-05-08809-JVS

OPINION

Appeal from the United States District Court
for the Central District of California
James V. Selna, District Judge, Presiding

Submitted April 11, 2008*
Pasadena, California

Filed April 30, 2008

Before: Alfred T. Goodwin, Harry Pregerson, and
Dorothy W. Nelson, Circuit Judges.

Opinion by Judge D.W. Nelson

*The panel unanimously finds this case suitable for decision without
oral argument. *See* Fed. R. App. P. 34(a)(2).

4663

**COUNSEL**

David M. Schiffman, Sidley Austin LLP, Chicago, Illinois, for the defendant-appellant.

Russell T. Burke, Nexsen Pruet, LLC, Columbia, South Carolina, for the plaintiff-appellant.

Gretchen M. Nelson, Kreindler & Kreindler LLP, Los Angeles, California, for the plaintiff-appellee.

## OPINION

D.W. NELSON, Senior Circuit Judge:

This appeal stems from a disagreement between two different groups of plaintiffs about who has standing as a "direct purchaser" to bring a claim under federal antitrust laws. One group consists of Delaware Valley Surgical Supply Company, Inc., ("DVSS") and Niagara Falls Memorial Medical Center ("Niagara"). They are both entities that bought medical supplies directly from Johnson & Johnson and its subsidiaries ("J&J"). The other plaintiff is Bamberg County Memorial Hospital & Nursing Center ("Bamberg"), a hospital that had a contract with J&J setting a list price for the purchase of medical supplies, but that ultimately purchased its J&J products through a separate contract with a third-party distributor.

DVSS, Niagara, and Bamberg all brought independent antitrust claims against J&J. The district court consolidated the three cases. Before reaching the merits of the underlying antitrust claims, the district court ruled that Bamberg lacked standing to assert its claim against J&J. The district court reasoned that because Bamberg bought its supply through a distributor and not from J&J, it was not a "direct purchaser." Bamberg and J&J both contest that decision through this interlocutory appeal. We affirm the order of the district court, and hold that Bamberg lacks standing to pursue an antitrust claim under a direct purchaser theory.

### FACTUAL AND PROCEDURAL BACKGROUND

Three plaintiffs brought antitrust actions against J&J arising from the manufacturer's contracts with hospitals and their group purchasing organizations ("GPOs"). This litigation involves two categories of products: sutures used to close wounds and endomechanical products ("endos") used primarily for minimally invasive laparoscopic surgery. The plaintiffs

are: (1) Bamberg, a hospital; (2) Niagara, a hospital; and (3) DVSS, a distributor of medical devices.

## I.  *The Underlying Antitrust Claims*

In December 2005 and January 2006, Bamberg, DVSS, and Niagara independently filed suit against J&J, claiming they were direct purchasers of J&J's endomechanical products. Their complaints allege that J&J's conduct is an unreasonable restraint of trade in violation of § 1 of the Sherman Act, 15 U.S.C. § 1, and an unlawful exclusive dealing in violation of § 3 of the Clayton Act, 15 U.S.C. § 14. The plaintiffs further allege that J&J monopolized or attempted to monopolize the relevant markets in violation of § 2 of the Sherman Act, 15 U.S.C. § 2.

More specifically, the plaintiffs assert that J&J impermissibly leveraged its monopoly power in sutures to create a monopoly in the endos market. They contest J&J's "market share purchase requirements," under which J&J enters into contractual arrangements that condition discounts and rebates on a buyer purchasing the bulk of its products from the company. This scheme, plaintiffs suggest, was coercive and resulted in artificially inflated prices. Plaintiffs also object to the bundled discounts offered to hospitals that purchase both sutures and endos from J&J. They allege that these bundled discounts are exclusionary because of J&J's dominance in the sutures market.

## II.  *Bamberg's Contracts with J&J and the Distributor*

Bamberg is a member of "Premier," a GPO which negotiated agreements with J&J on Bamberg's behalf. Those agreements set the pricing options for sutures and endo products. Bamberg then executed its own contracts with J&J pursuant to the terms of the Premier agreements. Those contracts noted that Bamberg would order products either directly from J&J or from an authorized distributor of J&J's products. Bamberg

chose the latter option and selected as its distributor Owens & Minor ("O&M"). Bamberg entered into a separate contract with O&M, which specified the terms of purchase for J&J products. Accordingly, Bamberg's contract with J&J did not result in the procurement of any goods directly from J&J. Bamberg did not pay J&J directly for any goods, and J&J did not ship any goods directly to Bamberg.

The distributor, O&M, is not owned or otherwise controlled by J&J. O&M's distributorship agreement with J&J specified that if products were sold to a J&J contract customer, the distributor would pay the manufacturer the set price that was negotiated between J&J and the GPO. In turn, Bamberg's contract with O&M permitted the distributor to charge a markup percentage. Accordingly, the final contract price paid by Bamberg was equal to the price negotiated under the Premier agreement with J&J, plus O&M's markup. Indisputably, Bamberg paid O&M directly for its orders, and O&M delivered the products to Bamberg.

III.   *Proceedings Below*

After this contractual scheme was laid out before the district court, DVSS moved for partial summary judgment. It argued that Bamberg did not have standing to seek damages because it was not a "direct purchaser" of J&J's products, as required by *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). J&J and Bamberg moved for a determination that Bamberg does have standing as a "direct purchaser" because the complaint challenges the legality of Bamberg's own contracts with J&J.

The district court entered an order denying the motions filed by J&J and Bamberg, and granting DVSS's motion for partial summary judgment. The court held that Bamberg is not a "direct purchaser" from J&J because it bought its products from an independent distributor, and therefore the hospital lacks standing to sue for antitrust damages. In the district

court's view, Bamberg's independent contract with J&J did "not change the fact that O&M is the direct purchaser here." *In re Endosurgical Products Direct Purchasher Antitrust Litig.*, No. CV-05-8809-JVS (C.D. Cal. Aug. 2, 2007). This interlocutory appeal followed.

## *JURISDICTION*

The federal courts have jurisdiction to consider questions alleging the violation of federal laws pursuant to 28 U.S.C. § 1331. We have jurisdiction over this interlocutory appeal pursuant to 28 U.S.C. § 1292(b).

## *STANDARD OF REVIEW*

"Standing is a question of law reviewed de novo." *Stewart v. Thorpe Holding Co. Profit Sharing Plan*, 207 F.3d 1143, 1148 (9th Cir. 2000). We also review de novo a district court's decision to grant summary judgment. *Id.* We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (en banc).

## *DISCUSSION*

### I.  *The Direct Purchaser Rule*

**[1]** Section 4 of the Clayton Act broadly authorizes that "any person who shall be injured" by a violation of the antitrust laws may seek treble damages from the offending party. 15 U.S.C. § 15(a). The Supreme Court has interpreted that section narrowly, thereby constraining the class of parties that have statutory standing to recover damages through antitrust suits. *See Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977); *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968). In particular, the Supreme Court has given con-

siderable attention to the question of who may assert a claim when a middleman, for example a distributor or a wholesaler, sits between an end user and a manufacturer.

**[2]** The first major case to consider the scope of § 4 was *Hanover Shoe*, 392 U.S. 481. There, Hanover alleged that United had monopolized the shoe manufacturing industry in violation of § 2 of the Sherman Act. *Id.* at 483. The plaintiff sought treble damages for overcharges paid in leasing certain machinery from United. *Id.* at 483-84. United defended itself using a "passing-on" theory, arguing that Hanover had passed on the overcharge to its customers and therefore had suffered no injury. *Id.* at 487-88. The Court rejected the pass-on defense for two reasons. First, it reasoned that establishing the amount of overcharge shifted to indirect purchasers "would normally prove insurmountable." *Id.* at 493. Second, it concluded that a pass-on defense would reduce the overall effectiveness of antitrust actions by diminishing the recovery available to any potential plaintiff. *Id.* at 494. Accordingly, the Court held that a party could not defend an antitrust suit brought by a middleman by showing that the actual injury caused by the overcharge was suffered by the end user. *Id.*

In *Illinois Brick*, the Supreme Court extended the *Hanover* principle to foreclose the offensive use of a pass-on theory. 431 U.S. at 728 (holding that indirect purchasers may not recover in an antitrust suit by proving that an overcharge was passed on to them through the distribution chain). There, the State of Illinois sued concrete block manufacturers for conspiring to raise prices in violation of § 1 of the Sherman Act. *Id.* at 726 27. The companies had sold blocks to contractors who acted as the middlemen before selling to the State. *Id.* at 726. The Court reasoned that the rule forbidding the use of a pass-on theory enunciated in *Hanover Shoe* should "apply equally to plaintiffs and defendants." *Id.* at 728. "[A]llowing offensive but not defensive use of pass-on would create a serious risk of multiple liability for defendants." *Id.* at 730. Accordingly, the State was foreclosed from asserting a suit

under § 4 of the Clayton Act because it did not buy concrete directly from the defendant manufacturers. *Id.* at 728-29.

**[3]** The Supreme Court further reasoned that the direct purchaser rule serves to eliminate the "evidentiary complexities and uncertainties" of apportioning overcharges between direct and indirect purchasers. *Id.* at 731-33, 740-43. "[A]ntitrust laws will be more effectively enforced by concentrating the full recovery for the overcharge in the direct purchasers rather than by allowing every plaintiff potentially affected by the overcharge to sue . . . ." *Id.* at 735. The Court explicitly rejected the State's attempt "to carve out exceptions to the *Hanover Shoe* rule for particular types of markets." *Id.* at 744. In sum, a bright line rule emerged from *Illinois Brick*: only direct purchasers have standing under § 4 of the Clayton Act to seek damages for antitrust violations. *See id.* at 735.

The Supreme Court reaffirmed the reasoning of *Illinois Brick* in *Kansas v. UtiliCorp United Inc.*, 497 U.S. 199 (1990). There, the States of Kansas and Missouri, on behalf of individual energy consumers, initiated suits against a pipeline company and five gas production companies, alleging that the defendants conspired to inflate the price of gas. *Id.* at 204. The Court determined that the States lacked standing because the consumers they represented were indirect purchasers. *Id.* at 207 ("In the distribution chain, they are not the immediate buyers from the alleged antitrust violators."). The consumers bought gas directly from the utilities, so "any antitrust claim against the defendants is . . . for the utilities to assert." *Id.*

The Court refused to create an exception to the *Illinois Brick* rule, even where its previous concerns "about the difficulties of apportionment, the risk of multiple recovery, and the diminution of incentives for private antitrust enforcement" would "not apply with equal force." *Id.* at 208. The Court rejected the States' argument that the rule should not apply because it would be relatively easy to apportion the over-

charge among the purchasers. *Id.* at 208-10. In order to avoid extensive fact-based litigation in antitrust suits to establish standing, the Court specifically noted its desire for a bright-line rule. *Id.* at 211 ("The difficulties posed by issues of [apportionment] led us to adopt the direct purchaser rule, and we must decline to create an exception that would require their litigation."). The Court noted that the *Illinois Brick* rule "often den[ies] relief to consumers who have paid inflated prices because of their status as indirect purchasers," *id.* at 211-12, yet refused to broaden the scope of relief in order to maintain stability in the law, *id.* at 216. The Court concluded,

> The rationales underlying *Hanover Shoe* and *Illinois Brick* will not apply in equal force in all cases. We nonetheless believe that ample justification exists for our stated decision not to 'carve out exceptions to the [direct purchaser] rule for particular types of markets.' The possibility of allowing an exception, even in rather meritorious circumstances, would undermine the rule.
>
> . . .
>
> In sum, even assuming that any economic assumptions underlying the *Illinois Brick* rule might be disproved in a specific case, we think it an unwarranted and counterproductive exercise to litigate a series of exceptions. Having stated the rule in *Hanover Shoe*, and adhered to it in *Illinois Brick*, we stand by our interpretation of § 4.

*Id.* at 216-17 (internal citation omitted).

In *Royal Printing Co. v. Kimberly-Clark Corp.*, 621 F.2d 323 (9th Cir. 1980), this circuit applied the direct purchaser rule. A printing company and other small businesses brought suit against ten manufacturers of paper products. *Id.* at 324. The plaintiffs had never bought paper products directly from

any of the defendants, but instead purchased through whole-saling firms. *Id.* This court permitted the suit to proceed inso-far as plaintiffs could demonstrate that the wholesaler was a subsidiary of a defendant. *Id.* at 326. However, those plain-tiffs who bought through independent wholesalers that were not owned or controlled by any defendant were only indirect purchasers. *Id.* at 327-28. Therefore, the *Illinois Brick* rule barred them from sustaining a suit under § 4 of the Clayton Act. *Id.*

We recently reaffirmed the direct purchaser rule in *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1049-50 (9th Cir. 2008). There, merchants brought an antitrust action against both credit card companies and banks, alleging that the defendants conspired to set fees on credit card purchases. *Id.* at 1044-45. We found that, because the fee at issue was set by the credit card companies and not by the banks, the banks were the "middlemen." *Id.* at 1048-49. As a result, plaintiffs could not maintain an antitrust suit against the credit card companies as direct purchasers because they ran "squarely into the *Illinois Brick* wall." *Id.* at 1049. The plaintiffs could not get around the direct purchaser rule because they failed to allege any facts showing that the banks were either controlled by or in a conspiracy with the credit card companies. *Id.* at 1050.

## II.  *Bamberg Is Not a Direct Purchaser*

### A.  *Precedent Controls the Outcome*

**[4]** Quite simply, we are bound by the sensible and straight-forward rule set forth by *Illinois Brick*. Appellants argue this situation is distinguishable because Bamberg and J&J did have an independent contractual relationship. However, Supreme Court jurisprudence has been neither vague nor ambiguous in establishing the direct purchaser rule. The Supreme Court intended to make a bright line rule for identi-fying the proper plaintiff when an antitrust violation occurs in a multi-tiered distribution system. *See Illinois Brick*, 431 U.S.

at 735-36. The Court has explicitly rejected attempts to create exceptions to that rule, even when the considerations in a particular market may undermine some of the reasoning used by the *Illinois Brick* Court. *See UtiliCorp*, 497 U.S. at 211. The undisputed truth is that Bamberg only indirectly purchased goods from J&J.

**[5]** Under the direct purchaser rule, Bamberg lacks standing under § 4 of the Clayton Act to assert an antitrust violation against J&J. It is undisputed that O&M, as the distributor, was the immediate purchaser of sutures and endo products from J&J. O&M paid J&J directly for its inventory and took title in the products before selling them to Bamberg. Bamberg directly paid O&M, not J&J, for its orders. O&M is not an agent or subsidiary of J&J, but rather an independently owned and managed company. Following the clear rule set forth in *Illinois Brick*, Bamberg lacks standing because the hospital is *not* a direct purchaser of products from J&J. Although the price that Bamberg pays O&M is set, in part, by an agreement negotiated by a GPO on behalf of Bamberg, the hospital contracted separately with O&M for the actual sale and delivery of products. The final price paid by Bamberg included the list price negotiated by Premier, plus a markup fee charged by O&M.

**[6]** The presence of a contractual relationship between Bamberg and J&J does not change the fact that Bamberg also had a contract with O&M, and it was that contract that ultimately effectuated the transfer of these goods. Furthermore, the plaintiffs are not merely seeking to invalidate an individual contract between a GPO and J&J; rather they are attacking the pricing scheme employed by J&J in its negotiations with a wide range of health care providers. Appellants' contention that we should myopically focus on the contract between Bamberg and J&J, without taking into consideration where the hospital actually bought its products, is therefore unavailing.

B.  *We Decline To Adopt Appellants' Reformulation of the Direct Purchaser Rule*

Appellants do not contend that Bamberg qualifies for any previously-recognized exception to the direct purchaser rule.[1] Rather, they urge this court to adopt a new rule that they believe is better attuned to the business relationships between health care providers and manufacturers. They contend that this case presents a common arrangement whereby a GPO negotiates prices with manufacturers on behalf of hospitals, but then individual hospitals place orders through independent distributors. Appellants assert that the hospital, not the distributor, is the direct victim of the alleged antitrust violation. Under their reasoning, the hospital is therefore the proper plaintiff to enforce the antitrust laws because any injury to the distributor was, at most, derivative. Bamberg and J&J propose that a party should be deemed a "direct purchaser" when (1) the plaintiff contracted directly with the defendant, (2) its complaint challenges the lawfulness of that contract and (3) the alleged injury is that the defendant charged artificially high prices in its contract with plaintiff. Under this new formulation of the *Illinois Brick* rule, Bamberg would have standing to bring suit against J&J, despite the fact that it actually bought its products from O&M. Bamberg did have a contract with J&J and the hospital contests the validity of the price set in that contract.

Appellants fail to persuade this court that there is anything extraordinary about the facts of this case warranting a deviation from the firmly established *Illinois Brick* rule. Appellants

---

[1] The case law recognizes standing for an indirect purchaser if (1) there was a pre-existing cost-plus contract, *see UtiliCorp*, 497 U.S. at 217-18, or (2) the direct purchaser is owned or controlled by the indirect purchaser, *Royal Printing Co.*, 621 F.2d at 326. Additionally, this court has held that an indirect purchaser may bring suit where he establishes a price-fixing conspiracy between the manufacturer and the middleman. *See Arizona v. Shamrock Foods Co.*, 729 F.2d 1208, 1211 (9th Cir. 1984). Appellants here have made no such allegation.

urge that we look to the substance of a plaintiff's antitrust theory, and not just the formalities of the purchase transaction to determine if there is standing. The allegedly predatory behavior here occurred in the manufacturer's dealings with the GPOs, who were representing the hospitals' interests. Appellants may well be correct in positing that a hospital has a greater incentive than a distributor to bring an antitrust claim when the conduct complained of involves price negotiations with a GPO. The distributor is not a party to the initial negotiations that set the list price for its products. Such a distributor arguably has a smaller stake in contesting the price than a hospital whose representative was part of those negotiations and felt that the manufacturer was engaging in illegal behavior.

**[7]** However, the Supreme Court has already rejected a similar argument. *See UtiliCorp*, 497 U.S. at 218. There, even though the middleman passed on 100 percent of the overcharge to consumers, the Supreme Court still held that the consumer was not a direct purchaser and only the middleman could bring an antitrust suit. *Id.* at 208-12, 218. In so doing, the Court closed the door on the theory that an end user who buys from an independent distributor rather than the manufacturer, should have standing because it may be the most efficient enforcer of antitrust laws. The Court ensured that the rule of *Illinois Brick* was straightforward so that it could be administered with "simplicity and certainty." *Id.* at 218. *Illinois Brick* is not a policy holding, but rather a case of statutory construction. *See California v. ARC America Corp.*, 490 U.S. 93, 102-03 (1989) ("As we made clear in *Illinois Brick*, the issue before the Court in both that case and in *Hanover Shoe* was strictly a question of statutory interpretation — what was the proper construction of § 4 of the Clayton Act."). The Court's firm rule does not provide us the leeway to make a policy determination on a case-by-case basis as to whether standing should be recognized when there are special business arrangements. *See Illinois Brick*, 431 U.S. at 744 ("We reject these attempts to carve out exceptions to the *Hanover Shoe*

rule for particular types of markets."). Accordingly, appellants' policy arguments are unavailing.

Even if we opted to strike out on a new path, we are not convinced that appellants' rule would be a better mechanism for enforcing antitrust violations. Adopting their formulation of the direct purchaser rule would still present problems of multiple liability and force courts to engage in complex factual inquiries to determine how damages should be apportioned between parties. For instance, under their rule, both O&M and Bamberg could theoretically bring a claim against J&J for the same overcharge. This would subject J&J to the possibility of multiple liability and would require the courts to disentangle the proper recovery for each party in the distribution chain. These are precisely the concerns that troubled the Supreme Court in *Illinois Brick*.

**[8]** Moreover, the distributor is not a completely irrelevant economic actor in this contractual framework. In theory, a demand curve exists for the bundle of goods and services that O&M sells. If the price of the goods is artificially inflated by the anti-competitive practices of J&J, that will affect the attractiveness of the distributor's products in the marketplace. There is no reason to believe that market forces do not work on O&M and other distributors. The presence of another distributor as a plaintiff in this case, DVSS, shows that distributors are indeed affected by J&J's allegedly predatory pricing scheme and do have incentives to bring suit against the manufacturer. This directly undermines Bamberg's argument that hospitals should always have standing because distributors will not be efficient enforcers of antitrust law. There are clearly other motivated plaintiffs, distributors and hospitals alike, who unquestionably meet the direct purchaser requirement and can serve the role of private attorney general contemplated by § 4 of the Clayton Act. The direct purchaser rule is a clearly established tenet of antitrust law and this case falls within its mandate.

### C. In re Lorazepam *Does Not Dictate a Different Result*

Appellants also attempt to find support for their position from a recent decision from the United States District Court for the District of Columbia. *See In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. 12, 20 (D.D.C. 2001). The plaintiffs there included an individual hospital, a GPO, and a health maintenance organization that operated hospitals. *Id.* at 14-15. The plaintiffs sought class certification as "direct purchasers" of drugs from pharmaceutical manufacturers who allegedly engaged in price-fixing. *Id.* at 22. The defendants moved to dismiss on the grounds that the plaintiffs had "neither adequately defined the term 'direct purchaser' nor sufficiently explained how they and other putative class members 'directly' purchased the drugs from [the defendant]." *Id.* The defendants contended that "direct purchasers are unascertainable" in the pharmaceuticals market. *Id.*

The district court disagreed, concluding that the plaintiffs had made a "sufficient showing of standing" to warrant class certification. *Id.* at 23. The district court noted, however, that plaintiffs "are members of the direct purchaser class 'to the extent that they purchased directly from [the defendant] for their own account.'" *Id.* Those purchasers were billed directly by the defendant, and paid the defendant directly for their products. *Id.* The district court noted that "discerning direct purchasers vis-à-vis indirect purchasers in the pharmaceuticals industry is complex." *Id.* But, the district court opted to approve class certification because it was wary that the complicated nature of this market would result in the "senseless point that no one may be sued for antitrust injury in the pharmaceuticals industry because it is too difficult to weed out the indirect purchasers." *Id.*

Furthermore, the *Lorazepam* court explicitly rejected the defendants' argument that the district court should adopt a rule that would better serve the business interests at issue in that case. *Id.* at 19-20. The district court noted that "any

exception to the *Illinois Brick* direct purchaser rule must be narrowly restricted to a situation in which complex market forces are stripped of their effect due to preexisting conditions, such as with a cost-plus contract, so that the pass-on is clearly discernable." *Id.* at 19-20. The court refused to entertain policy arguments advocating for a new exception. *Id.* at 20. Similarly, we reject appellants' attempt to craft a new rule that they suggest would be better suited to enforce antitrust laws in the modern healthcare industry.

*Lorazepam* simply does not buttress appellants' position — in fact, it undermines many of their arguments. Unlike this case, the *Lorazepam* suit was a class action. The district court certified the class of "putative direct purchasers" to allow the suit to go forward, but the court was careful to note that a direct purchaser was a plaintiff who "purchased directly from" the manufacturer. *Id.* at 23. Bamberg did not purchase its products directly from J&J. Rather, it was invoiced by, and sent payments directly to, O&M. In *Lorazepam*, the district court's willingness to grant class certification so that litigation could proceed does not support a finding that this court should relax the direct purchaser rule when we have parties before us that clearly do satisfy the direct purchaser standard. The *Lorazepam* court itself never stated that a party who was shown not to be a direct purchaser could ultimately seek recovery. Instead, by saying that a party was a member of the class "to the extent" they were direct purchasers, the *Lorazepam* court endorsed the *Illinois Brick* rule. *See id.*

## CONCLUSION

For the foregoing reasons, we affirm the order of the district court, holding that Bamberg lacks standing to seek damages for an alleged antitrust violation.

AFFIRMED.