**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

In re: ATM FEE ANTITRUST
LITIGATION,

---

PAMELA BRENNAN; TERRY CRAYTON;
DARLA MARTINEZ,
          *Plaintiffs-Appellants,*

v.

CONCORD EFS, INC.; BANK ONE
CORPORATION; BANK ONE, N.A.;
J.P. MORGAN CHASE & CO.;
CITIBANK (WEST), F.S.B.DE;
SUNTRUST BANKS, INC.; WACHOVIA
CORPORATION; WELLS FARGO BANK,
N.A.; SERVUS FINANCIAL CORP.;
CITIBANK, N.A.; FIRST DATA
CORPORATION; BANK OF AMERICA,
N.A.,
          *Defendants-Appellees.*

No. 10-17354

D.C. No.
3:04-cv-02676-CRB

OPINION

Appeal from the United States District Court
for the Northern District of California
Charles R. Breyer, District Judge, Presiding

Argued and Submitted
December 6, 2011—San Francisco, California

Filed July 12, 2012

7993

Before: Carlos F. Lucero,* Consuelo M. Callahan, and
N. Randy Smith, Circuit Judges.

Opinion by Judge N.R. Smith

*The Honorable Carlos F. Lucero, Circuit Judge for the Tenth Circuit,
sitting by designation.

## COUNSEL

Joseph R. Saveri, Brendan P. Glackin, and Andew S. Kingsdale, Leiff Cabraser Heimann & Bernstein, LLP, San Francisco, California; Merrill G. Davidoff (argued), Bart D. Cohen, and Michael J. Kane, Berger & Montague, P.C., Philadelphia, Pennsylvania, for the plaintiffs-appellants.

W. Stephen Smith and Deanne E. Maynard (argued), Morrison & Foerster LLP, Washington, D.C.; Robert S. Stern and Sylvia Rivera, Morrison & Foerster LLP, Los Angeles, Cali-

fornia, for defendant-appellee J.P. Morgan Chase Bank, N.A., successor-in-interest to Bank One, N.A.

Sonya D. Winner (argued) and Anita F. Stork, Covington & Burling LLP, San Francisco, California, for defendant-appellee Bank of America, N.A.

Stephen V. Bomse, Orrick, Herrington & Sutcliffe, LLP, San Francisco, California, for defendant-appellee Suntrust Bank, Inc.

David F. Graham and Eric H. Grush, Sidley Austin LLP, Chicago, Illinois, for defendants-appellees Citibank, N.A. and Citibank (West), FSB.

Jack R. Nelson, Reed Smith LLP, San Francisco, California, for defendant-appellee Wachovia Corp.

Daniel M. Wall and Joshua N. Holian, Latham & Watkins, San Francisco, California, and Donald I. Baker, Baker & Miller, Washington, D.C., for defendants-appellees Wells Fargo Bank, N.A. and Servus Financial Corp.

Peter E. Moll and Brian D. Wallach, Cadwalader, Wickersham & Taft LLP, Washington, D.C., for defendants-appellees Concord EFS, Inc. and First Data Corp.

---

## OPINION

N.R. SMITH, Circuit Judge:

Plaintiffs-Appellants (Plaintiffs) are automated teller machine (ATM) cardholders, who allege horizontal price fixing of fees paid to the ATM owners by the banks (issuing the ATM cards to the cardholders) when cardholders retrieve cash from an ATM not owned by their bank. Plaintiffs do not

directly pay the allegedly fixed fee; therefore, as indirect purchasers, Supreme Court precedent prohibits Plaintiffs from bringing this suit. *See Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). Further, Plaintiffs do not qualify for the narrow exceptions to the *Illinois Brick* rule, because (1) they do not allege a conspiracy to fix the price paid by the Plaintiffs and (2) the banks are not controlled by each other or by the ATM network. Therefore, Plaintiffs do not have standing under § 4 of the Clayton Act to proceed with their § 1 Sherman Act suit. We thus affirm the district court's summary judgment dismissal of this suit for lack of antitrust standing.

We limit our discussion in this opinion to the issues relevant to standing. Because Plaintiffs lack antitrust standing, we do not address Plaintiffs' appeal regarding the district court's (1) determination that the rule of reason, and not the per se rule, applies here; (2) rejection of the single-brand, derivative aftermarket alleged in the complaint; and (3) determination that Plaintiffs' claim against Bank of America, N.A., did not relate back to the filing of the original complaint under Rule 15(c) of the Federal Rules of Civil Procedure.

## I.    BACKGROUND

### A.    Facts

A "foreign ATM transaction" occurs when ATM cardholders withdraw money from their bank account using an ATM not owned by their bank (which issued them the card). Such foreign ATM transactions involve four parties: (1) the cardholder, i.e., the person using the ATM to retrieve money from his or her bank account; (2) the card-issuing bank, i.e., the bank at which the cardholder holds an account and who issues the cardholder an ATM card; (3) the ATM owner, i.e., the entity that owns the machine used by the cardholder; and (4) the ATM network, i.e., the entity that connects the ATM owners with card-issuing banks. Of all these parties, the ATM network plays a particularly important role in this fact situa-

tion. The network administers agreements between card-issuing banks and ATM owners to ensure that customers can withdraw money from network member ATMs.

Foreign ATM transactions generate four fees. The cardholder must pay two of these fees—one to the ATM owner for use of the ATM (known as a "surcharge") and one to the card-issuing bank (known as a "foreign ATM fee"). The card-issuing bank also pays two of these fees—one to the ATM network that routed the transaction (known as a "switch fee") and one to the ATM owner (known as an "interchange fee"). At issue in this case are the interchange fee and the foreign ATM fee. The ATM network (not the card-issuing bank nor the ATM owners) establishes the interchange fee. Individual card-issuing banks set their own foreign ATM fees.

The STAR Network (STAR) is the ATM network at issue in this case. STAR has thousands of members who collectively own hundreds of thousands of ATMs nationwide. These members can be roughly divided into three groups. The first group includes so-called Independent Service Organizations ("ISOs"). ISOs own ATMs, but they are not banks and do not issue ATM cards (e.g., grocery stores or gas stations). The second group consists of financial institutions that accept deposits and issue ATM cards, but do not own any ATMs (e.g., credit unions or internet banks). The third and largest STAR member group includes financial institutions that both issue ATM cards and own ATMs. The defendant banks (or Bank Defendants) named in this case, which include all defendants except for Concord EFS, Inc. (Concord) and First Data Corporation, fit into this category. Until February 1, 2001, STAR was a member-owned network. As a member-owned network, member banks (including Bank Defendants), controlled STAR and set the interchange fees paid by the members. On February 1, 2001, Defendant-Appellee Concord, a publicly traded Delaware corporation, acquired STAR. After the acquisition by Concord, Bank Defendants lacked control of STAR based on ownership and board member

appointment, because Concord was not owned by the member banks of STAR.

Some Bank Defendants were concerned about the acquisition by Concord, because Concord was not owned by the member banks and thus Bank Defendants would likely lose influence over policies and pricing decisions (such as interchange fees). To moderate this concern, before the acquisition STAR revised its agreement with its members to include language that indicated that it would not change fees arbitrarily and that it would consider the interests of its members before implementing any changes. Additionally, to allegedly quell the reluctance by the Bank Defendants, Concord agreed to retain the pre-acquisition Chief Executive Officer of STAR (who has no formal affiliation with the Bank Defendants) to run the new network and agreed to elect him to Concord's board of directors to give a voice to the Bank Defendants. Concord also agreed to establish a Network Advisory Board (comprised of the larger member banks including Bank Defendants) to advise Concord concerning the interests of the large financial institutions. The Network Advisory Board would provide input to Concord's board as to policy and pricing decisions, but had no authority to determine or veto interchange fee changes.

In February 2004, First Data Corporation (another Delaware corporation) acquired Concord. As such, after February 2004, First Data owned and operated STAR.[1]

## B.  Procedural History

On July 2, 2004, Plaintiffs filed suit. On behalf of themselves and all those similarly situated, Plaintiffs alleged that Defendants engaged in horizontal price fixing, a per se viola-

---

[1]For simplicity, throughout the rest of the opinion we refer to Concord as the owner and operator of STAR even though First Data took over that role in 2004.

tion of § 1 of the Sherman Act. They alleged that Defendants colluded to fix the STAR interchange fee, which is then passed on to Plaintiffs as part of the foreign ATM fee. Plaintiffs sought damages dating back to July 2, 2000.

Defendants filed a motion to dismiss arguing that Plaintiffs, as indirect purchasers, lacked standing to allege an antitrust violation pursuant to *Illinois Brick*. *In re ATM Fee Antitrust Litig.*, 768 F. Supp. 2d 984, 990 (N.D. Cal. 2009). On September 4, 2009, the district court denied the motion to dismiss. *Id.* at 994. Accepting all of Plaintiffs' allegations as true and construing the pleadings in the light most favorable to Plaintiffs, the district court found that Plaintiffs' suit could not be dismissed for lack of standing. *Id.* at 992-94. The court found that there was no realistic possibility that the Bank Defendants would sue STAR and that Plaintiffs alleged that they were "purchasing directly from the price-fixing conspirators . . . ." *Id.* at 992. On October 19, 2009, Plaintiffs filed their third amended complaint.

Subsequently, "Defendants . . . moved for summary judgment, [again] arguing that the *Illinois Brick* rule barring indirect purchasers from recovering monetary damages in an antitrust suit applies here and precludes Plaintiffs from seeking such damages." *In re ATM Fee Antitrust Litigation*, No. C 04-02676 CRB, 2010 WL 3701912, at *4 (N.D. Cal. Sep. 16, 2010). On September 16, 2010, the district court granted Defendants' motion for summary judgment and dismissed Plaintiffs' claim on the ground that Plaintiffs lack standing under *Illinois Brick*'s direct purchaser rule. *Id.* at *11. Finding no genuine issue of material fact, the district court found Plaintiffs to be indirect purchasers. *Id.* at *12. Plaintiffs did not directly pay the alleged fixed interchange fees—labeled by the district court as the alleged "unlawful fee." *Id.* at *5.

> Critically, Plaintiffs do *not* allege that Defendants have conspired to illegally fix the foreign ATM fee that Plaintiffs pay to their bank when they use a for-

eign ATM. . . . Importantly, Plaintiffs do not allege that the Defendants or any other banks have conspired to fix the foreign ATM fee that Plaintiffs must pay. . . . Instead, Plaintiffs assert that their banks pay an unlawfully inflated interchange fee and then pass the cost of the artificially high interchange fee along to them through foreign ATM fees. . . . Plaintiffs . . . do not pay this allegedly unlawful fee directly (their banks do) and therefore are not directly harmed by it. . . . Plaintiffs do not dispute that they pay the purportedly unlawful interchange fee only indirectly. . . . Plaintiffs therefore acknowledge that they are only indirect payers of the interchange fee and that the banks are the direct payers. . . . Given that Plaintiffs are not "direct purchasers" of the unlawful fee, their damages claims are barred by the *Illinois Brick* rule, unless an exception to the rule applies.

*Id.* at \*2, \*3, \*5. The district court found no exception applicable.[2] *Id.* at \*5-10. The district court filed a final judgment against Plaintiffs on September 17, 2010. A timely appeal followed.

---

[2]Notably, "Plaintiffs argue[d] that there is 'no realistic possibility' that the direct purchasers of interchange fees—i.e., the card-issuing banks—would file a lawsuit challenging the unlawful fixing of those fees, for several reasons." *Id.* at \*7. The district court rejected the argument, "because it ignores the critical fact that the overwhelming majority of ATM card-issuing banks pay more in interchange fees than they receive." *Id.* In other words, they are net payers. *Id.* "Because they pay more in interchange fees than they receive, the higher the interchange fee, the higher their costs. Thus, there is a very realistic possibility that these entities (or some subset of them) would file suit to challenge the fixing of interchange fees at artificially high rates." *Id.* at \*8. In the end, the district court concluded that "card-issuing banks are better-off if interchange fees are eliminated," and so they have incentive to sue. *Id.*

## II. JURISDICTION AND STANDARD OF REVIEW

Federal district courts have jurisdiction over "questions alleging the violation of federal laws pursuant to 28 U.S.C. § 1331." *Del. Valley Surgical Supply Inc. v. Johnson & Johnson*, 523 F.3d 1116, 1119 (9th Cir. 2008). We have jurisdiction over appeals from final decisions of district courts. 28 U.S.C. § 1291.

Standing is a question of law for the district court to decide. *See Warth v. Seldin*, 422 U.S. 490, 498-99 (1975); *Del. Valley*, 523 F.3d at 1119; *see also Haase v. Sessions*, 835 F.2d 902, 904 (D.C. Cir. 1987) ("[T]he ultimate responsibility to ensure subject matter jurisdiction always lies with the court, not the parties."). Because the court (and not a jury) decides standing, the district court must decide issues of fact necessary to make the standing determination. *See Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 72 (1978) (district court held four days of hearings to decide motion to dismiss for want of standing). "The fact-finding of the [district] court to support or deny standing is subject to review under the clearly erroneous standard." *Haase*, 835 F.2d at 907 (citing *Duke Power*, 438 U.S. at 77 ("[W]e cannot say we are left with 'the definite and firm conviction that' the finding by the trial court . . . is clearly erroneous; and, hence, we are bound to accept it." (citation omitted))). However, when standing is challenged on summary judgment, "[t]he court shall [not] grant summary judgment if the movant shows that there is [a] genuine dispute as to any material fact . . . ." Fed. R. Civ. P. 56(a); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) ("[E]ach element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation."). Therefore, if there is a genuine issue of material fact, then summary judgment is inappropriate without the district court resolving the factual dispute. *See Bischoff v. Osceola Cnty., Fla.*, 222 F.3d 874, 878-80 (11th Cir. 2000); *see*

*also Haase*, 835 F.2d at 907, 910. "Several [other] circuits explicitly prohibit district courts from resolving disputed factual questions or making credibility determinations essential to the question of standing on the basis of affidavits alone." Harry T. Edwards & Linda A. Elliott, *Federal Standards of Review* Ch. III.A (2007) (citing *Bischoff*, 222 F.3d at 880-81 (following First and Fifth Circuit cases)). We need not decide whether the district court must conduct additional evidentiary inquiries or the necessary extent of those inquires when resolving issues of material fact at the summary judgment stage, because our holding confronts no genuine issue of material fact and does not rely on factual findings of the district court.

When a district court determines standing on summary judgment (as is the case here), "[w]e must determine [de novo], viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Del. Valley*, 523 F.3d at 1119. In the absence of genuine issues of material fact, we may affirm the district court's summary judgment "on any ground supported by the record, regardless of whether the district court relied upon, rejected, or even considered that ground," *Kling v. Hallmark Cards Inc.*, 225 F.3d 1030, 1039 (9th Cir. 2000), if "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III.  DISCUSSION

Under § 4 of the Clayton Act, "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue . . . and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15(a). However, "[t]he Supreme Court has interpreted that section narrowly, thereby constraining the class of parties that have statutory standing to recover damages through antitrust suits."

*Del. Valley*, 523 F.3d at 1119 (citing *Illinois Brick*, 431 U.S. 720).

**[1]** The Supreme Court has held that a direct purchaser has "been injured in its business as required by [§ ] 4" even though it passes on "claimed illegal overcharge[s] to" its customers. *Illinois Brick*, 431 U.S. at 724 (discussing *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481 (1968)). Thus, defendants may not use a pass-on theory to challenge the standing of direct purchasers. However, the Supreme Court has also held that § 4 of the Clayton Act does not "permit offensive use of a pass-on theory against an alleged violator that could not use the same theory as a defense in an action by direct purchasers." *Id.* at 735. In other words, indirect purchasers may not use a pass-on theory to recover damages and thus have no standing to sue. *Id.* at 745-46. This rule (the *Illinois Brick* rule), that indirect purchasers suffer no injury under § 4, was reaffirmed in *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 207 (1990). "In sum, a bright line rule emerged from *Illinois Brick*: only direct purchasers have standing under § 4 of the Clayton Act to seek damages for antitrust violations." *Del. Valley*, 523 F.3d at 1120-21.

The underlying purposes for the rule are (1) "to eliminate the complications of apportioning overcharges between direct and indirect purchasers," *UtiliCorp*, 497 U.S. at 208; (2) "to eliminate multiple recoveries," *id.* at 212; and (3) to "promote the vigorous enforcement of the antitrust laws," *id.* at 214. However, the Supreme Court has stated that, while "[t]he rationales underlying . . . *Illinois Brick* will not apply with equal force in all cases[, w]e nonetheless believe that ample justification exists for our stated decision not to 'carve out exceptions to the [direct purchaser] rule for particular types of markets.' " *Id.* at 216 (second alteration in original) (quoting *Illinois Brick*, 431 U.S. at 744). "[E]ven assuming that any economic assumptions underlying the *Illinois Brick* rule might be disproved in a specific case, we think it an unwarranted and counterproductive exercise to litigate a series of

exceptions." *Id.* at 217; *see also Del. Valley*, 523 F.3d at 1124 ("The Court's firm rule does not provide us the leeway to make a policy determination on a case-by-case basis as to whether standing should be recognized when there are special business arrangements.").

**[2]** While the Supreme Court has expressed reluctance in carving out exceptions to the *Illinois Brick* rule, limited exceptions do exist. First, the Supreme Court recognized standing for indirect purchasers when a preexisting cost-plus contract with the direct purchaser exists. *Illinois Brick*, 431 U.S. at 736; *Utilicorp*, 497 U.S. at 217-18. Second, indirect purchasers may have standing under a "co-conspirator" exception. 2A Phillip E. Areeda et al., *Antitrust Law* ¶ 346h (3d ed. 2007). The court explained this exception, stating that "an indirect purchaser may bring suit where he establishes a price-fixing conspiracy between the manufacturer and the middleman." *Del. Valley*, 523 F.3d at 1123 n.1 (citing *Arizona v. Shamrock Foods*, Co., 729 F.2d 1208, 1211 (9th Cir. 1984)). However, for the indirect purchaser to merit standing under this exception, the conspiracy must fix the price paid by the plaintiffs. *Shamrock Foods*, 729 F.2d at 1211. Third, indirect purchasers may sue when customers of the direct purchaser own or control the direct purchaser, *Illinois Brick*, 431 U.S. at 736 n.16, or when a conspiring seller owns or controls the direct purchaser, *Royal Printing Co. v. Kimberly Clark Corp.*, 621 F.2d 323, 326 (9th Cir. 1990). For example, an indirect purchaser may sue if the direct purchaser is a division or subsidiary of the price-fixing seller. *Id.* In *Freeman*, our court may have outlined a fourth exception, that "indirect purchasers can sue for damages if there is no realistic possibility that the direct purchaser will sue," relying on the seller's control of the direct purchaser. *Freeman*, 322 F.3d at 1145-46 (citing *Royal Printing Co.*, 621 F.2d at 326). However, whether there is such an exception is unclear, because we held

that standing existed in *Freeman* based on the control or co-conspirator exceptions.[3] *See id.*

In this case, the parties argue over the contours of these exceptions. But after review, none of the exceptions allow Plaintiffs to avoid "run[ning] squarely into the *Illinois Brick* wall." *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1049 (9th Cir. 2008).

## A. Indirect Purchasers

**[3]** Plaintiffs argue that they should be considered as direct purchasers or fit within the co-conspirator exception, because the foreign ATM fee they have paid is an illegally fixed fee as defined by antitrust law.[4] However, Plaintiffs concede that they have never directly paid interchange fees. Instead, card-issuing banks (including Bank Defendants) pay interchange fees and then include them when they charge foreign ATM fees (alleged by Plaintiffs to be artificially inflated). In other words, the Bank Defendants pass on the cost of the interchange fees through the foreign ATM fees. The district court found Plaintiffs to be indirect purchasers, because they do not directly pay the fixed interchange fee, labeled by the district court as the alleged "unlawful fee." *In re ATM Fee Antitrust Litig.*, 2010 WL 3701912, at *5. The district court found it important that "Plaintiffs do not allege that the Defendants or any other banks have conspired to fix the foreign ATM fee that the Plaintiffs must pay." *Id.* at *2. We agree with the district court that Plaintiffs are indirect purchasers.

---

[3]"[T]he exception that [*Freeman*] purported to recognize is not yet one acknowledged by the Supreme Court, which has thus far been indifferent to the question whether the direct purchaser is likely to sue. What the [Ninth Circuit] was really describing was a 'control' or perhaps a 'co-conspirator' exception." 2A Phillip E. Areeda et al., *Antitrust Law* ¶ 346f (3d ed. 2007).

[4]Although the argument touches upon the initial inquiry whether Plaintiffs are indirect purchasers, we address the argument within our discussion of the co-conspirator exception.

## B.   Exceptions to *Illinois Brick*

### 1.   *No Preexisting Cost-Plus Contract*

[4] Plaintiffs do not contend that they had a preexisting cost-plus contract with Defendants. Therefore, this exception, allowing indirect purchasers to sue when they have a preexisting cost-plus contract with the direct purchaser, *Illinois Brick*, 431 U.S. at 736; *Utilicorp*, 497 U.S. at 217-18, does not apply here.

### 2.   *Co-Conspirator Exception and the Price "Fixed"*

This co-conspirator exception allows an indirect purchaser to sue when co-conspirators set the price paid by the plaintiff. 2A Phillip E. Areeda et al., *Antitrust Law* ¶ 346h ("*Illinois Brick* does not limit suits by consumers against a manufacturer who illegally contracted with its dealers to set the latter's resale price. The consumer plaintiff is a direct purchaser from the dealer who . . . has conspired illegally with the manufacturer with respect to the very price paid by the consumer." (footnote omitted)).

Specifically, our circuit has outlined this exception in *Shamrock Foods* as applying when the direct purchaser conspires horizontally or vertically to fix the price paid by the plaintiffs. 729 F.2d at 1211. In *Shamrock Foods*, consumers alleged that retail grocery stores conspired with dairy producers, who also sold directly to consumers, to fix the retail prices of dairy products. *Id. Illinois Brick* did not apply, because "the retail price was the one fixed," and thus, the "theory of recovery d[id] not depend on pass-on damages." *Id.*; *see also id.* at 1214 ("The consumers confine their claim for damages . . . solely to that overcharge resulting from a retail level price-fixing conspiracy. There is no need to apportion that overcharge because it was not passed on to the consumers through any other level in the distribution chain."). As the district court aptly noted, this co-conspirator exception is

not really an exception at all. *In re ATM Fee Antitrust Litig.*, 2010 WL 3701912, at *6; *see also* 2A Phillip E. Areeda et al., *Antitrust Law* ¶ 346h ("Whether one adopts a co-conspirator exception or regards this situation as outside *Illinois Brick*'s domain, there is no tracing or apportionment to be done." (footnote omitted)). If the direct purchaser conspires to fix the price paid by the plaintiffs, then the plaintiffs pay the fixed price directly and are not indirect purchasers (i.e., there is no pass-on theory involved). *See Shamrock Foods,* 729 F.2d at 1211-12.

Here, the district court found *Shamrock Foods* inapplicable, because

> Plaintiffs in this case, unlike the plaintiffs in *Shamrock Foods*, do not allege that Defendants conspired to fix the price Plaintiffs paid (*i.e.*, the foreign ATM fee). Instead, Plaintiffs allege that Defendants fixed the interchange fee that Star Network pay one another and then passed along the artificially inflated fee to Plaintiffs. Thus, unlike *Shamrock Foods*, Plaintiffs' theory of recovery expressly depends on pass-on damages. . . . In short, the *Shamrock Foods* exception applies where the Defendants have conspired to fix the price that Plaintiffs paid directly. That is not the case here.

*In re ATM Fee Antitrust Litig.*, 2010 WL 3701912, at *6 (internal quotation marks and alterations omitted). We agree with the district court.

As we emphasized in *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, the price paid by plaintiffs must be fixed. *Kendall* applies particularly well to this case, because it involved similar allegations and fee structures. In *Kendall*, merchants sued credit card companies (or Consortiums) and banks, alleging that they conspired to set the transaction fee charged to merchants for each retail transaction—i.e., the merchant discount

fee—by setting the interchange fees charged by the Consortiums to the issuing banks. *Id.* at 1049. The merchant plaintiffs alleged that setting the interchange fees "establish[ed] a minimum amount for the merchant discount fees." *Id.* However, the merchant plaintiffs "[ran] squarely into the *Illinois Brick* wall," with respect to interchange fees, because they were not charged the interchange fee directly. *Id.* Also, "[a]ppellants allege[d] the Consortiums indirectly establish[ed] the minimum merchant discount fee the Banks charge[ed] Merchants." *Id.* "[T]his allegation [was] barred by *Illinois Brick* to the extent that the Consortiums d[id] not directly set the merchant discount fee; the acquiring bank sets that fee." *Id.* More importantly, the *Kendall* plaintiffs alleged that the credit card companies directly conspired with the banks *to set the merchant discount fee*, so they should have standing under the co-conspirator exception. *Id.* at 1050. Critically, the plaintiffs alleged a conspiracy to fix the price paid by the plaintiffs. *Id.* Although the court rejected the argument because plaintiffs provided no facts to support such a conspiracy, the court found significant the fact that the plaintiffs did "not allege any facts showing the Consortiums have any direct control over the merchant discount fee the acquiring bank chooses to charge . . . ." *Id.*

[5] The *Kendall* plaintiffs failed to show a conspiracy "to set merchant discount fees," and "appellants [did] not allege any facts showing the Consortiums ha[d] any direct control over the merchant discount fee." *Id.* As such, *Kendall* reaffirmed that the co-conspirator exception applies when the conspirators set the price paid by the consumer. The same analysis applies in our case. Here, while Plaintiffs allege a conspiracy to set interchange fees, they fail to show a conspiracy to set foreign ATM fees. Plaintiffs do not allege that STAR has control to set foreign ATM fees. Further, Bank Defendants have no control over the foreign ATM fees of other Bank Defendants or STAR members.

[6] The Fourth Circuit also requires that plaintiffs allege a conspiracy to fix the price paid by the plaintiffs. *Dickson v.*

*Microsoft Corp.*, 309 F.3d 193 (4th Cir. 2002). In *Dickson*, computer purchasers alleged that license agreements between computer sellers and Microsoft

> resulted in supracompetitive prices for Microsoft's operating system and application software. [Computer purchasers do] not allege any conspiracy between Microsoft and the OEM Defendants to set the resale price of the software. Instead, [they] claim[ ] that overcharges were passed on to the consumers by the OEM Defendants when the consumers purchased personal computers (PCs) from the OEM Defendants.

309 F.3d at 200. As such, *Dickson* held the claim it faced to be "materially indistinguishable from the claim under consideration in *Illinois Brick*, and [the plaintiffs'] inclusion of a conspiracy allegation [was] insufficient to circumvent the *Illinois Brick* rule." *Id.* at 215. *Dickson* acknowledged the trend of recognizing a co-conspirator exception. *Id.* at 214-15. However, the court "interpret[ed] these cases as standing for the more narrow proposition that *Illinois Brick* is inapplicable to a particular type of conspiracy—price-fixing conspiracies." *Id.* at 215. In other words, the court concluded that only a conspiracy to fix the price paid by the consumer is an exception to *Illinois Brick*, because it is "grounded on the damages theory underlying the alleged conspiracy"—i.e., "no overcharge has been passed on to the consumer." *Id. Dickson* refused to recognize an exception when plaintiffs allege a conspiracy but the conspirators did not fix the price paid by the plaintiffs, because such an action would be contrary to the Supreme Court's direction not to carve out exceptions to the *Illinois Brick* rule. *Id.* at 214 (citing *Utilicorp*, 497 U.S. at 216 ("We . . . believe that ample justification exists for our stated decision not to 'carve out exceptions to the [direct purchaser] rule for particular types of markets.' " (quoting *Illinois Brick*, 431 U.S. at 744))).

**[7]** Although *Dickson* cites *Shamrock Foods* as an example of the co-conspirator exception, *id.* at 214-15, *Shamrock Foods* parallels *Dickson*'s understanding that the exception only applies when the co-conspirators fix the price paid by the plaintiff. *Shamrock Foods* held that *Illinois Brick* does not apply when co-conspirators fix the retail price paid by consumers because the "theory of recovery does not depend on pass-on of damages . . . ."[5] *See* 729 F.2d at 1211. *Shamrock Foods* then indicates that a conspiracy to fix upstream prices relies on the pass-on damages *Illinois Brick* prohibits. *See id.* Therefore, we agree with the Fourth Circuit and decline to extend the co-conspirator exception past the situation when alleged co-conspirators set the price paid by the plaintiffs.

Plaintiffs argue that they have standing here, because Defendants conspired to fix interchange fees for the purpose and effect of fixing foreign ATM fees. In sum, Plaintiffs argue that the foreign ATM fee was "fixed," because

> [w]hen the term 'fix prices' is used, that term is used in its larger sense. A combination or conspiracy formed for the purpose and with the effect of raising, depressing, fixing, pegging or stabilizing the price of a commodity in interstate commerce is unreasonable per se under the Sherman Act.

*Plymouth Dealers' Ass'n of N. Cal. v. United States*, 279 F.2d 128, 132 (9th Cir. 1960); *see also Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 48 (1990) (per curiam). Plaintiffs argue that Defendants conspired to fix interchange fees for the purpose of raising foreign ATM fees. Therefore, Defendants fixed the

---

[5]Plaintiffs argue that *Delaware Valley* construed *Shamrock Foods* to mean that plaintiffs have standing by "establish[ing] a price-fixing conspiracy between manufacturer and middleman—without regard to the price at issue." But *Delaware Valley* only discussed *Shamrock Foods* in a passing footnote and did not describe the scope of the price-fixing conspiracy. *Delaware Valley*, 523 F.3d at 1123 n.1.

foreign ATM fees (which Plaintiffs directly paid), and Plaintiffs have standing.

**[8]** However, Plaintiffs' argument hinges on what it means to "fix" a price. The district court and Defendants suggest that, in the *Illinois Brick* context, fixing a price sets the price directly paid, not a price latter passed-on as part of the price at issue. However, Plaintiffs argue that conspiring to set a price for the purpose and effect of raising the price at issue equates to fixing that price and makes the payers of the raised price direct purchasers.

Plaintiffs' argument misses the mark. *Illinois Brick* rejected this argument when it rejected "mark up" claims. *See* 431 U.S. at 744. Plaintiffs' argument re-characterizes the "mark up" claim by alleging that the Defendants imposed fixed interchange fees for the purpose of marking up foreign ATM fees. Plaintiffs' argument differs little from the argument that a fixed percentage mark up or a price-fixed good used in the ultimate product should allow indirect purchasers to sue, because the price ultimately paid by Plaintiffs includes the fixed costs. However, the Supreme Court expressly rejected such arguments, based largely on the reasoning that "[f]irms in many sectors of the economy rely to an extent on cost-based rules of thumb in setting prices . . . [and t]he intricacies of tracing the effect of an overcharge on the purchaser's prices, costs, sales, and profits . . . are not spared the litigants." *Id.* Further, Plaintiffs do not allege here that the banks agreed to fix the level of the "mark up" in the foreign ATM fees or even whether such fees would be charged at all. The third amended complaint states that "Defendants have continued to impose fixed Interchange Fees because the Bank Defendants mark them up to set Foreign ATM Fees, which generate substantial revenues for Bank Defendants." Plaintiffs allege a mark up of foreign ATM fees to pass on the interchange fees. The allegation contradicts *Illinois Brick*, because *Illinois Brick* rejected exceptions for markups by middlemen

or when the price-fixed good is a vital input to a larger product. 431 U.S. at 743-45.

Moreover, Plaintiffs' cited precedent does not support the argument that foreign ATM fees were fixed. *See Plymouth Dealers' Ass'n*, 279 F.2d at 132; *Palmer*, 498 U.S. at 48. Neither case involved the question of who is injured under § 4 of the Clayton Act or pass-on theories. In *Plymouth Dealers' Ass'n*, car dealers agreed to a fixed price list that would be the starting point for bargaining. 279 F.2d at 132. In *Palmer*, competitors agreed to give one of them the exclusive rights to Georgia. 498 U.S. at 47-48. Neither involved passing on the price fixed through the price paid by the plaintiffs. Both cases determined what constituted fixing prices under § 1 of the Sherman Act. *See, e.g.*, *Plymouth Dealers' Ass'n*, 279 F.2d at 132 (holding that conspiring to raise, depress, fix, peg, or stabilize a price "is unreasonable per se under the *Sherman Act*" (emphasis added)).

However, as in *Illinois Brick*, our task involves determining whether Plaintiffs are injured within the meaning of § 4 of the Clayton Act. *See Illinois Brick*, 431 U.S. at 723-26. Section 4 of the Clayton Act provides: "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue . . . ." 15 U.S.C. § 15(a). Therefore, *Plymouth Dealers' Association* and *Palmer* decided what constitutes "anything forbidden in the antitrust laws," while *Illinois Brick* decided whether injury results based on a pass-on theory. *See Illinois Brick*, 431 U.S. at 729 ("[T]he overcharged direct purchaser, and not others in the chain of manufacture or distribution, is the party 'injured in his business or property' within the meaning of [§ 4 of the Clayton Act] . . . ."). In sum, the price paid by plaintiffs must be the price set (not merely "fixed" in some broad sense) for plaintiffs to be a direct purchaser under the narrowly defined injury requirement of § 4 of the Clayton Act. Further, under the co-conspirator exception recognized in this circuit, the price paid by a plaintiff must be set by the conspiracy and not

merely affected by the setting of another price. *See Shamrock Foods*, 729 F.2d at 1211.

Plaintiffs cite *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979 (9th Cir. 2000), for the proposition that Defendants effectively fixed foreign ATM fees by fixing interchange fees, which thus gives Plaintiffs standing. However, Plaintiffs inappropriately rely on *Knevelbaard*, because *Knevelbaard* found antitrust injury under California's Cartwright Act, which "is enlarged, by statute, in comparison to federal law." *Id.* at 991. "As a result, the more restrictive definition of antitrust injury under [*Illinois Brick*] does not apply to the Cartwright Act." *Id.* (internal quotation marks omitted). Because "California law affords standing more liberally than does federal law," *Knevelbaard* did not decide whether antitrust injury, or standing, existed under *Illinois Brick*. *See id.* at 987.

Lastly, *Freeman* fails to support Plaintiffs' argument that the foreign ATM fees were "fixed." In *Freeman*, realtor associations formed a single MLS[6] database ran by Sandicor, a corporation they created, owned, and controlled. 322 F.3d at 1141, 1146. The plaintiffs alleged that the associations conspired to fix support fees charged to Sandicor, and that these fees inflated the MLS fees charged by Sandicor and paid by plaintiffs. *Id.* at 1142. The associations fixed the support fees charged to Sandicor, and Sandicor set the MLS fees charged to subscribers. *Id.* at 1141, 1145. *Freeman* held that fixing the support fees artificially inflated that MLS fees paid by the plaintiffs. *See Freeman*, 322 F.3d at 1145.

[9] Contrary to Plaintiffs' argument, *Freeman* demonstrates that fixing one fee for the purpose and effect of inflat-

---

[6]"[T]he Multiple Listing Service, or 'MLS,' [ ] lets agents share information about properties on the market with the help of a computerized database. Agents who subscribe to the MLS can peruse the listings of other subscribers and post their own." *Freeman*, 322 F.3d at 1140.

ing another fee does not make the purchaser a direct purchaser under *Illinois Brick*. In *Freeman*, the court was forced to find an exception to *Illinois Brick* even though the court found price fixing by setting the support fees and passing them on through MLS fees. *Id.* at 1145-46. Therefore, in the context of *Illinois Brick*, fixing an upstream cost did not equate to fixing the price paid by the plaintiffs. Standing existed in *Freeman*, not because the associations fixed the support fees for the purpose and effect of raising MLS fees, but because of the associations' ownership and control of Sandicor (the direct purchaser). *Id.* at 1145-46 (citing *Royal Printing*, 621 F.2d at 326).

**[10]** Plaintiffs argue *Freeman* relies on the co-conspirator exception, because the court noted that the associations, in essence, had agreed to have the MLS charge be $44. *See* 322 F.3d at 1146 (comparing the case to resale price maintenance and noting that "Defendants can't turn a horizontal agreement to fix prices into something innocuous just by changing the way they keep their books"). However, even if *Freeman* applied the co-conspirator exception, it does not help Plaintiffs. The defendants in that case conspired to effectively set the price paid by the customers of the MLS. *See id.* (associations effectively "agree[d] among themselves to resell [MLS database access] with support services for exactly $22.50"). Here, unlike *Freeman*, the Bank Defendants independently set the fee paid by Plaintiffs (i.e., foreign ATM fee) and the amount of such fee varies between Bank Defendants. As such, Defendants have not conspired to set the foreign ATM fees unlike the associations in *Freeman* effectively setting the price for Sandicor's MLS service.

Plaintiffs next argue that they have standing, because they "purchased directly from price-fixing Defendants," an argument closely related to the argument that the foreign ATM fees were "fixed." In other words, Plaintiffs argue that the direct purchaser Bank Defendants conspired to fix the interchange fees (an upstream cost), so Plaintiffs purchased from

a horizontal price fixing conspirator. They argue *Illinois Brick* does not apply even though Defendants did not fix the price Plaintiffs directly paid, because they are purchasing from a violator. However, because *Shamrock Foods* only involved the setting of the price actually paid (and not an upstream price that was then passed on), we would have to extend our current co-conspirator exception. Though other courts have,[7] we decline to do so.

---

[7]In *In re TFT LCD (Flat Panel) Antitrust Litigation*, the Northern District of California held that a purchaser of a finished TFT-LCD product was a direct purchaser, even though "the alleged price-fixing conspiracy existed only with regard to TFT-LCD panels, and not finished products." 267 F.R.D. 291, 306-07 (N.D. Cal. 2010). The district court classified consumers of the final products as direct purchasers because they "purchase[d] directly from the alleged violator." *Id.* at 307 (quoting *In re Sugar Indus. Antitrust Litig.*, 579 F.2d 13, 17 (3d Cir. 1978)). In support of the conclusion, the Northern District of California cited two Third Circuit cases.

In *In re Sugar Industries Antitrust Litigation*, the Third Circuit classified candy wholesalers as direct purchasers because the candy manufacturers also refined sugar (sugar refiners being the alleged violators). 579 F.2d at 17-18. In *In re Sugar Industries*, the plaintiff "limited the issue to the summary judgment only insofar as it affects the direct purchases of candy from defendants," because "in the face of *Illinois Brick* . . . plaintiff has no hope of success on the purchases from nondefendants." *Id.* at 16. Thus, *In re Sugar Industries* actually exemplifies the exception allowed when an upstream violator controls or owns the direct purchaser, which is discussed in more detail below. *See id.* at 18-19; 2A Phillip E. Areeda et al., *Antitrust Law* ¶ 346f & n. 41.

Later, in *In re Linerboard Antitrust Litigation*, the Third Circuit classified purchasers of corrugated sheets and boxes as direct purchasers of linerboard (which was included in the purchased corrugated sheets and boxes), because the linerboard was subject to a price-fixing agreement. 305 F.3d 145, 158-60 (3d Cir. 2002) ("*Illinois Brick* . . . bans Clayton Act lawsuits by persons who are not direct purchasers from the defendant antitrust violator."). Similarly, the Seventh Circuit has held that "the first purchaser[ ] from *outside* the conspiracy" may sue. *Paper Sys. Inc. v. Nippon Paper Indus. Co.*, 281 F.3d 629, 631-32 (7th Cir. 2002). Thus, these cases restrict *Illinois Brick*'s influence by allowing an exception when the direct purchaser conspires with the seller, even though the price illegally set is an upstream cost that is passed-on to the plaintiffs. This contradicts the Supreme Court's admonition "not to 'carve out exceptions to the [direct purchaser] rule for particular types of markets.' " *Utilicorp*, 497 U.S. at 216 (quoting *Illinois Brick*, 431 U.S. at 744).

**[11]** Based on our precedent in *Kendall* and *Shamrock Foods*, we recognize the co-conspirator exception only when the conspiracy involves setting the price paid by the plaintiffs. Therefore, as the district court concluded, the exception does not apply, because the theory of recovery depends on pass-on damages. We decline to extend the co-conspirator exception further. As in *Kendall*, Plaintiffs "run into the *Illinois Brick* wall," because Plaintiffs do not pay interchange fees directly and the Bank Defendants independently set foreign ATM fees.

3.   *Ownership and Control and* Freeman's *"No Realistic Possibility that Direct Purchasers Will Sue"*

*Royal Printing* allowed indirect purchasers to sue "where a direct purchaser is a division or subsidiary of a co-conspirator." 621 F.2d at 326. *Royal Printing* created an exception when parental control existed, because applying *Illinois Brick* "would eliminate the threat of private enforcement," *id.* at 326 n.7, and "close off every avenue for private enforcement," *id.* at 327. "The co-conspirator parent will forbid its subsidiary or division to bring a lawsuit that would only reveal the parents own participation in the conspiracy." *Id.* at 326. In our case, neither Bank Defendants nor STAR are divisions or subsidiaries of the other. However, Plaintiffs argue that the exception in *Royal Printing* should, as construed in *Freeman*, 621 F.2d at 1145-46, apply in any event. We disagree.

**[12]** *Freeman*, citing *Royal Printing*, enunciated the exception as follows: "[I]ndirect purchasers can sue for damages if there is no realistic possibility that the direct purchaser will sue its supplier over the antitrust violation." *Freeman*, 322 F.3d at 1145-46. However, *Freeman* did not create a new variation of the *Royal Printing* exception, because *Freeman* relied on ownership and control to find standing. *Id.* at 1146 ("The associations own Sandicor . . . , [t]hey appoint its board of directors, and they are accused of conspiring with it."); *id.*

at 1146 n.12 ("*Royal Printing* applies because the associations own Sandicor."). In *Freeman*, the co-conspiring realtor associations owned and controlled Sandicor (the direct purchaser) and had the power to appoint Sandicor's board of directors. *Id.* Thus, in *Freeman,* we found no realistic possibility of suit, because the associations owned and controlled the direct purchaser.[8] *Id.* at 1146. Therefore, *Freeman* outlines that, whether a realistic possibility of suit exists, depends on the existence of ownership or control between the direct purchaser and the seller. *See, e.g.*, *Royal Printing*, 621 F.2d at 326 n.7 ("[I]f Royal Printing is . . . barred [from suing], and the *controlled* wholesalers will not sue, the appellees' transactions would be immune from private antitrust enforcement." (emphasis added)).

We do not overlook that Plaintiffs argue that there is no realistic possibility that the Bank Defendants will sue STAR or their co-defendants, because the district court preliminarily denied the Defendants' motion to dismiss (on September 4, 2009) on such grounds. *In re ATM Fee Antitrust Litig.*, 768 F. Supp. 2d at 991-92. However on summary judgment (with more information in the record than at the time of the motion to dismiss), the district court subsequently found a lack of standing, because there was a realistic possibility of suit by pure-payer (and net-payer) direct purchasers of the interchange fee.[9] *In re ATM Fee Antitrust Litig.*, 2010 WL 3701912.

---

[8]*Freeman* concludes the paragraph discussing the exception by stating that "[t]here's no realistic possibility Sandicor will sue them," but in the corresponding footnote the court finds *Royal Printing* applicable because of the associations *ownership* of Sandicor. 322 F.3d at 1146 n.12.

[9]We do not rely on the same reasoning as the district court, because *Royal Printing* may cast some doubt on the district court's conclusion. In *Royal Printing*, we found that the plaintiffs had standing to sue for the purchases they had made from wholesalers controlled by the paper manufactures even though the plaintiffs also made purchases from independent wholesalers. *Royal Printing*, 621 F.2d at 324, 327-28.

**[13]** In *Royal Printing* and *Freeman*, the ownership or control of the direct purchasers by the conspiring sellers created no realistic possibility of suit. Here, Plaintiffs do not allege that STAR owns or controls Bank Defendants or that Bank Defendants own or control other Bank Defendants. Thus, this case does not involve a lack of a realistic possibility of suit because of the seller (STAR) prohibiting the direct purchasers (Bank Defendants) from suing through its ownership or control, as found in *Royal Printing* and *Freeman*. Instead, this case deals with whether a realistic possibility of suit exists when a direct purchaser conspires with the seller to set a cost passed-on to Plaintiffs. We decline to extend the exception noted in *Royal Printing* and *Freeman* to situations where the seller does not own or control the direct purchasers, because, after *Royal Printing*, the Supreme Court stated that "[t]he possibility of allowing an exception, even in rather meritorious circumstances, would undermine the rule." *Utilicorp*, 497 U.S. at 216; *see* 2A Phillip E. Areeda et al., *Antitrust Law* ¶ 346h ("[T]he Supreme Court . . . has thus far been indifferent to the question whether the direct purchaser is likely to sue . . . .").

Plaintiffs argue that Bank Defendants owned or controlled STAR. The applicable statute does not define control. Therefore, we construe it in its ordinary, contemporary, and common meaning. *United States v. Bennett*, 621 F.3d 1131, 1139 n.2 (9th Cir. 2010). Control means " 'to exercise restraint or direction over; dominate, regulate, or command,' " *id.* (quoting Webster's College Dictionary 297 (Random House 1991)), or to have "the 'power or authority to guide or manage,' " *id.* (quoting Webster's New Collegiate Dictionary 285 (9th ed.1983)).

**[14]** Plaintiffs' outline sources purported to show that Bank Defendants' ownership and control of STAR foreclosed a realistic possibility of suit. However, Bank Defendants did not control STAR after Concord, a publicly owned Delaware

corporation, purchased STAR on February 1, 2001.[10] Former stockholders of STAR owned, in aggregate, approximately ten percent of Concord's outstanding common stock after the merger. Because of Concord's widely disbursed ownership and Bank Defendants' small ownership percentage, Bank Defendants had insufficient ownership interests to control Concord and thus STAR. *Cf. Weinstein Enters., Inc. v. Orloff*, 870 A.2d 499, 506-08 (Del. 2005) (in finding that a fiduciary duty exists, a shareholder must have control of the affairs of the corporation, which does not exist unless the shareholder owns a majority of the stock or has actual control over the corporation's conduct); *Kaplan v. Centex Corp.*, 284 A.2d 119, 122-23 (Del. Ch. 1971) ("A plaintiff who alleges domination of a board of directors and/or control of its affairs must prove it. Stock ownership alone, at least when it amounts to less than a majority, is not sufficient proof of domination or control." (citation omitted)). Moreover, the language added to STAR's agreement with its members does not create control, because (1) it is a negotiated agreement between STAR and its members, and (2) STAR still has the ultimate power to change interchange fees based on market conditions. The language essentially protects Bank Defendants from arbitrary changes, but Concord has the power to change interchange fees if changes are reasonably related to prevailing market conditions. Likewise, the Network Advisory Board (composed of large member banks like Bank Defendants) does not create control, because it had no power to set interchange fees or to control Concord's board. The Network Advisory Board has influence, because it represents the views of large member banks. However, input on policies and pricing issues by interested members does not constitute the type of control necessary to meet the exception to *Illinois Brick*. *See Freeman*, 322

---

[10]As for the time period from July 2, 2000, to February 1, 2001, there are no allegations that Bank Defendants controlled one another or conspired to fix foreign ATM fees. As such, the concern in *Royal Printing* of a controlling party prohibiting the direct purchaser from suing is not present here.

F.3d at 1145-46 (control existed from ownership); *cf. Werner v. Miller Tech. Mgmt., L.P.*, 831 A.2d 318, 328 (Del. Ch. 2003) ("The ability to offer ideas [by the Advisory Board] cannot be construed as an ability to manage the affairs of Interprise."). As a Delaware corporation, Concord's board of directors has the power, authority, and responsibility to manage the corporation. Del. Code Ann. tit. 8, § 141. Therefore, to control STAR, the Bank Defendants must have had control of Concord's board of directors, which is not demonstrated here.

## CONCLUSION

[15] For these reasons, we AFFIRM the district court's summary judgment. Plaintiffs lack standing to seek damages for the alleged antitrust violations.